In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-4159

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JOEL TURNER, JR.,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Western Division.
No. 3:05-cr-50082-11—**Philip G. Reinhard**, *Judge.*

ARGUED SEPTEMBER 24, 2009—DECIDED APRIL 30, 2010

Before POSNER, MANION, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Joel Turner, Jr. was convicted of a drug conspiracy and firearms offense and was sentenced to 300 months in prison. He challenges the evidence upon which the district court relied in finding that he was a member of the conspiracy in January 2005 and in making its drug quantity finding. He also argues that the court erred in not considering unwarranted sentencing disparities among his codefendants and ignored

sentencing factors, which resulted in an unreasonable sentence. Finding no error, we affirm.

## I. Background

The government indicted sixteen defendants, including Joel Turner, Jr., on multiple counts of drug and gun crimes. Turner pled guilty to Counts One and Two of the second superseding indictment. The former count charged him with a criminal drug conspiracy, 21 U.S.C. § 846, and the latter count charged him with possession of a firearm in furtherance of a criminal drug trafficking crime, 18 U.S.C. § 924(c)(1)(A). Turner was sentenced to 240 months on Count One and 60 months on Count Two, to be served consecutively. We already have decided the appeals of several of Turner's codefendants. *See United States v. Easter*, 553 F.3d 519 (7th Cir. 2009), *cert. denied sub nom. McKay v. United States*, 130 S. Ct. 1281 (Jan. 25, 2010) (No. 08-10584).

Turner admitted the following facts, among others, which are taken from his written plea agreement: From at least August 10, 2005, and continuing through at least August 22, 2005, Turner was a member of the Titanic Stones street gang and agreed with Darrell "Duck" Davis and others to sell controlled substances, primarily consisting of heroin. In August 2005, Turner sold heroin out of a drug house operated by the organization at 1023 Kishwaukee in Rockford, Illinois. The organization of which Turner was a part operated the drug house at 1023 Kishwaukee between August 9, 2005 and September 13, 2005. Davis supplied several members of

the organization with packs of heroin and crack cocaine (cocaine base) to sell from the house during that time period. On August 10, 2005, Turner sold several individually wrapped packets of heroin to customers out of the Kishwaukee house. Each packet weighed approximately .2 grams and was sold for $20. While the organization ran the drug house at 1023 Kishwaukee, the doors of the house were fortified to prevent the police and rivals from getting in, and many members of the organization, including Turner, possessed firearms to protect the organization's drugs and drug proceeds. On August 10, 2005, in furtherance of the conspiracy charged in Count One and his heroin sales at the Kishwaukee drug house, Turner possessed a firearm for the purpose of protecting himself, the heroin, and the proceeds from the heroin sale.

In addition, Turner admitted that he was guilty as charged in Counts One and Two of the second superseding indictment. The district court accepted his guilty pleas, found a factual basis for the pleas, and adjudged him guilty.

The probation office prepared a presentence investigation report ("PSR") on Turner. The PSR attributed one to three kilograms of heroin and at least fifty grams of cocaine base to Turner, and accordingly found a base offense level of 32 under U.S.S.G. § 2D1.1(a)(3), (c)(4). However, the PSR also found that he was a career offender under U.S.S.G. § 4B1.1(a). As a result, Turner's criminal history category was VI. U.S.S.G. § 4B1.1(b). Based on his career offender status and the fact that he was

convicted under 18 U.S.C. § 924(c) and another offense, the PSR found that the applicable Guideline range was the greater of (A) 211 to 248 months (the range determined by adding the mandatory minimum of 60 consecutive months to the range of 151 to 188 months determined on Count One) and (B) 262 to 327 months (the range determined using the table in § 4B1.1(c)(3) because Turner received a three-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1). *See* U.S.S.G. § 4B1.1(c)(2). Turner filed an objection to the PSR and a sentencing memorandum.

At Turner's sentencing hearing, the court found that the residence at 821 Buckbee was a drug house from which the conspirators sold heroin between 2002 and 2005 (the conspirators operated several different drug houses), that Turner was arrested in the Buckbee house on January 18, 2005, and that Turner sold heroin from the Buckbee house. The court also considered that Turner was incarcerated from January 26 until his release on July 27, 2005, and that shortly after his release from custody, he became involved in the conspiracy at the drug house at 1023 Kishwaukee. From all the evidence, the court found that Turner was involved in the conspiracy at least as of January 18, 2005, and again became involved in the conspiracy upon his release from custody in late July that same year. (The court said that Turner never really left the conspiracy; he just was not an active member while incarcerated.) These findings were based on all the evidence, including that part of the trial testimony of codefendant Ambrose Jones (who had testified at the trial of three of Turner's

codefendants) which the court found sufficiently reliable, as well as on information in Turner's PSR about his January 18, 2005 arrest at the Buckbee house.

The sentencing court assessed the drug amount even though that issue was trumped by Turner's status as a career offender. In making the drug quantity finding, the court reviewed the transcripts of the sentencing hearings of codefendants Darrell Davis and Jamaul McKay and considered its finding that Turner was involved in the conspiracy during the operation of the drug house at 1023 Kishwaukee for a thirty-day period. The court also relied on its previous finding that slightly over one-half of one kilogram of heroin was sold out of the Kishwaukee house during that thirty-day period. The court determined that Turner was responsible for all the quantities sold out of the Kishwaukee house during that thirty-day period.

The sentencing court also considered whether Turner was responsible for a quantity of drugs sold at any other time period. The court noted its finding that Turner was involved in the conspiracy at the Buckbee house and, based on testimony from McKay's sentencing hearing, found "that there were quantities sold at that house" and that "almost another half kilo was sold." In addition, the court relied on the credible trial "testimony as to approximately what was sold out of each drug house," which included the testimony of codefendants Bobby Harris and Dupree Turner, who gave information about the organization's operations. The sentencing court found Turner responsible for a total quantity of

700 grams to one kilogram of heroin, resulting in a base offense level of 30 under U.S.S.G. § 2D1.1(c)(5). Turner was sentenced to 240 months on Count One and a consecutive 60 months on Count Two.

## II. Discussion

Turner argues that the district court's finding that he was involved in the conspiracy in January 2005 and its drug quantity finding were not based on a preponderance of the evidence. He also argues that the court erred in believing that it could not consider sentencing disparities among codefendants. And he argues that his sentence is substantively unreasonable when weighed against the sentencing factors.

We review de novo whether the district court followed proper sentencing procedures and we review factual findings for clear error. *United States v. Pulley*, No. 08-3363, 2010 WL 537574, at *2 (7th Cir. Feb. 17, 2010). We defer to a district court's credibility finding, "which can virtually never be clear error." *Id.* (citing *United States v. Acosta*, 534 F.3d 574, 584 (7th Cir. 2008)). The substantive reasonableness of a sentence is reviewed for an abuse of discretion, and we presume that a properly calculated, within-Guidelines sentence is reasonable. *Id.*

### A. Findings Regarding Turner's Involvement in the Conspiracy and Drug Quantity

Turner contends that the sentencing court's finding that he was involved in the conspiracy on January 18, 2005,

and its resulting drug quantity finding were not supported by a preponderance of the evidence. He maintains that these erroneous findings made his career offender range seem closer to the advisory Guideline range than it was, and the sentencing court could have considered the difference in deciding whether his career offender status overstated his criminal history.

The government must establish the drug quantity by a preponderance of the evidence. *United States v. Cox*, 536 F.3d 723, 729 (7th Cir.), *cert. denied*, 129 S. Ct. 770 (2008). A sentencing court may "rely on information that has 'sufficient indicia of reliability to support its probable accuracy.'" *Pulley*, 2010 WL 537574, at *3 (quoting *United States v. Rollins*, 544 F.3d 820, 838 (7th Cir. 2008)). When a court relies on information contained in a presentence report, "the defendant bears the burden of showing that the presentence report is inaccurate or unreliable." *United States v. Heckel*, 570 F.3d 791, 795 (7th Cir. 2009) (quotation omitted). A defendant's bare denial of information in a presentence report is insufficient to challenge its accuracy and reliability. *Id.*

In the case of a jointly undertaken criminal activity, a defendant may be held accountable for "'all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity.'" *United States v. Soto-Piedra*, 525 F.3d 527, 531 (7th Cir. 2008) (quoting U.S.S.G. § 1B1.3(a)(1)(B)). Thus, in a drug conspiracy, "each conspirator is responsible not only for drug quantities directly attributable to him but also for amounts involved in transactions by coconspirators

that were reasonably foreseeable to him." *Acosta*, 534 F.3d at 585 (quoting *United States v. McLee*, 436 F.3d 751, 765 (7th Cir. 2006)).

Turner asserts that the government acknowledged in its brief that it offered only two facts to support a finding that he had joined the conspiracy on January 18, 2005: Jones's trial testimony that Turner sold heroin at the Buckbee house in January 2005 and information in Turner's PSR related to his January 18 arrest at the Buckbee house. Turner argues that neither fact supports a finding by a preponderance that he was involved in the conspiracy since at least January 18, 2005. Although Jones could not testify as to the specific dates or the quantity of drugs that was sold, the district court credited Jones's trial testimony about the various houses from which the organization sold drugs and the estimate of dates. Specifically, Jones testified that the organization sold heroin out of the Buckbee house at some point between 2002 and 2005. He also testified that he saw Turner sell heroin from the Buckbee house. This testimony supports the district court's finding that Turner was part of the conspiracy on January 18, 2005.

Turner acknowledges that his arrest record supports a finding that he was present at the Buckbee house on January 18, 2005, but claims that the record contradicts Jones's testimony. The arrest record noted that Turner denied that the heroin was his and that his cousin claimed the drugs. The district court was capable of weighing these claims against the other evidence, including the evidence that a confidential informant made

a controlled buy of heroin from someone at the Buckbee house and that officers executing a search warrant at the house entered and discovered Turner, who attempted to thwart their entry and resisted arrest. Officers observed a plastic bag sticking out of Turner's mouth; he later spit out twenty-five plastic baggies containing heroin. Codefendant McKay also was in the house and the front door was fortified. Other evidence, including Turner's own admissions, established that he was a member of the conspiracy in August 2005 and sold heroin at that time.

Although Turner argues that the sentencing court refused to rely on the police report and gave assurances that it would not rely on offenses not resulting in convictions, he takes the court's comments out of context. Turner had objected to the inclusion in the PSR's criminal history section of information regarding arrests for cases that were either dismissed or never initiated. The court's remark that it would not consider mere arrests that did not result in convictions was made in addressing that objection. In effect, the court was indicating that it would not rely on such arrests in determining Turner's criminal history score. (The PSR didn't count those arrests in computing Turner's criminal history score either.) The court did not disclaim all reliance on the *information underlying* such arrests, however.

Together, Jones's testimony and the arrest report allow a reasonable inference that Turner was involved in the conspiracy since at least January 18, 2005, and sold heroin from the Buckbee house. And that's not all. Turner

admitted that he was a member of the conspiracy from at least August 10, 2005; that he agreed with Davis and others to sell controlled substances, primarily heroin; and that he sold heroin out of another drug house operated by the organization in August 2005. The evidence of Turner's involvement in the conspiracy following his release from custody in late July 2005 supported the inference that he was involved in the conspiracy at the time of his arrest back in January 2005. Turner has not denied that he was arrested at the Buckbee house on January 18, 2005, or that he was in possession of heroin at the time of his arrest.

Turner also challenges the basis for the sentencing court's drug quantity findings from the Buckbee house. In prior sentencings, the court found that Davis bought in one kilogram quantities, assumed that one house operated at a time, and inferred that the organization sold approximately one-half kilogram quantities a month from January to the beginning of September 2005. In addition, there was evidence from Turner's arrest record that a confidential informant bought heroin at the Buckbee house and that Turner was found in the house with plastic baggies of heroin, indicative of selling. The evidence of the drug quantity from the Kishwaukee house in August and September 2005 and the ongoing nature of the organization's drug dealing support a reasonable inference of the quantities sold in the earlier part of the year. Thus, reasonable inferences supported the sentencing court's finding that one-half kilogram of heroin was sold from the Buckbee house in January 2005.

Turner contests the sentencing court's reliance on testimony at the sentencing hearings of Anthony K. Glover, Montrell McSwain, and Davis as support for its drug quantity findings. Turner first asserts that the court concluded at Glover's and McSwain's sentencings that the government could not establish when they sold heroin, for how long, or how much heroin was sold at the Buckbee house. At Glover's sentencing, the government sought to hold Glover accountable for a drug quantity of ten to thirty kilograms—a drug quantity much greater than that asserted in Turner's case. Although the court questioned whether the government could prove that quantity, Glover stipulated that the government could prove that the drug quantity was at least three kilograms but no more than ten kilograms. Thus, the court did not find that the government's evidence of drug quantity was unreliable, as Turner suggests.

Similarly, the government attempted to prove that McSwain was accountable for ten to thirty kilograms of heroin, again a quantity substantially greater than that for which the government sought to hold Turner accountable. But the court found McSwain responsible only for more than one kilogram of heroin sold at the Kishwaukee house and the Third Street house (another drug house run by the conspirators) in 2005. The court said that it could not accurately find what the quantities were for the period from roughly the end of 2002 through 2005; instead, it had to resort to estimating the drug quantities, which it was permitted to do. *See Easter*, 553 F.3d at 524. The court based its estimation on Jones's testimony, which it credited, that there was an ongoing

conspiracy to sell during that time period (2002 through 2005) and the quantities that were found in various drug raids. The court found that this evidence supported a drug quantity of over one kilogram and probably "near three to ten kilos, but I can't tell exactly." The court therefore found McSwain responsible for at least one kilogram but less than 3 kilograms of heroin.

Turner argues that Jones could not identify which houses operated on which dates or how much was sold out of any house, including the Buckbee house. But the court did not have to rely on Jones's testimony to establish the specific dates on which the organization sold heroin out of the Buckbee house. The court could draw reasonable inferences from information provided in Turner's PSR—he was arrested at the Buckbee house on January 18, 2005, and he had twenty-five baggies of heroin in his mouth at the time. These facts along with other reliable evidence in the record, including Turner's admission that he was part of the conspiracy in August 2005 and the testimony about the organization's extensive drug distribution and use of other drug houses permit the reasonable inference that the organization was selling heroin from the Buckbee house in January 2005.

And Turner challenges the sentencing court's reliance on its findings at McKay's sentencing to support its conclusion that "almost another half kilo" of heroin was sold at the Buckbee house. Turner claims there was no evidence that McKay sold heroin at the Buckbee house: McKay's drug quantity calculation was based on

drug (crack) quantities sold at the Underwood and Kishwaukee drug houses. These criticisms are well-taken. McKay stipulated to the quantity of heroin (960 grams) sold from the Underwood and Kishwaukee drug houses when he was involved with those houses. It does not appear that McKay was involved at the Buckbee house. However, in finding the drug quantity sold from the Buckbee house, the court relied not only on its findings at McKay's sentencing, but also on "testimony as to approximately what was sold out of each drug house during the period of time." And the court earlier had referred to the transcript from Davis's sentencing as the basis for finding reliable evidence as to drug quantity. At Davis's sentencing, the court found that the organization sold about one-half kilogram per month from January through the beginning of September 2005. This finding was based on trial testimony of codefendants Jones, Dupree Turner, and Bobby Harris; the many arrests of conspirators and discovery of drugs from 2002 through 2005; evidence from garbage pulls from two of the drug houses; testimony from persons who had made several purchases of heroin from members of the conspiracy; and a surveillance tape covering an eight-day period of time of the traffic at the Kishwaukee house.

Turner further complains that the court held him accountable for a full month's distribution of heroin even though the government can point to only a single day in January 2005 that he was allegedly involved in the conspiracy. The court did say that it would not hold Turner accountable for the heroin sold while he was in

custody between January and July 2005. (Of course, as we noted at oral argument, nothing prevented the court from holding him accountable for all the heroin sold during this period. Though Turner may not have been an active member of the conspiracy while in custody, there is no evidence that he withdrew from the conspiracy. *See United States v. Julian*, 427 F.3d 471, 483 (7th Cir. 2005) (stating that in order to withdraw from a conspiracy, a defendant must take some affirmative act; "[s]imply ceasing to participate even for extended periods of time is not sufficient to show withdrawal" (quotation omitted)). Thus, he could have been held accountable for heroin sold while he was incarcerated. Turner can hardly complain that he was held responsible for one-half of January's heroin sales from the Buckbee house when he could have been held accountable for a much greater quantity.) The fact that Turner was only found at the Buckbee house on one day does not negate the reasonable inference drawn by the sentencing court that his participation extended beyond (and prior to) that date. A defendant's presence at a drug house is not the determinative factor in assessing accountability for drug quantity. Where, as here, the offense is a conspiracy, the drug quantity for which a defendant may be held accountable is based on "'all reasonably foreseeable acts and omissions of others in furtherance of the jointly under-taken criminal activity.'" *Soto-Piedra*, 525 F.3d at 531 (quoting U.S.S.G. § 1B1.3(a)(1)(B)).

Nor are we persuaded by Turner's argument that his career offender status substantially over-represents the seriousness of his criminal history, justifying a reduced

sentence. Turner cites *United States v. Liddell*, 543 F.3d 877 (7th Cir. 2008), *cert. denied*, 129 S. Ct. 2747 (2009), where we said that "there is no statutory provision instructing courts to sentence a career offender at or near the statutory maximum." *Id.* at 884 (quoting *United States v. Sanchez*, 517 F.3d 651, 663 (2d Cir. 2008)). That is certainly correct. And we recently ruled that sentencing courts are free to disagree with the career offender Guideline. *United States v. Corner*, 598 F.3d 411, 415-16 (7th Cir. 2010) (en banc). The sentencing court's comments show that it understood that the career offender Guideline was advisory. And the court carefully considered Turner's assertion that application of the career offender Guideline greatly exaggerated his criminal history. But the court ultimately concluded that Turner's criminal history did not justify a variance below the Guideline. We see no reason to disagree with that reasoned determination.

## B. Sentencing Disparities Among Codefendants

The argument that the district court erred in failing to consider unwarranted sentencing disparities is also unavailing. Section "3553(a)(6) does not allow unwarranted sentencing disparities between codefendants," *Pulley*, 2010 WL 537574, at *6 (citing *United States v. Statham*, 581 F.3d 548, 556 (7th Cir. 2009); *United States v. Bartlett*, 567 F.3d 901, 908, 909 (7th Cir. 2009)), but "warranted disparities are allowed," *id.* A court that sentences within a properly calculated Guidelines range "necessarily gives weight and consideration to avoiding

unwarranted disparities." *Id.* (citing *Bartlett*, 567 F.3d at 908).

The court identified several justifications for the sentencing disparities between Turner and his codefendants. First, Turner was sentenced as a career offender; none of Turner's codefendants were sentenced as career offenders. The career offender Guideline was intended to punish career offenders more severely than other offenders. *See* 28 U.S.C. § 994(h); U.S.S.G. § 4B1.1, cmt. (background). Second, some of the codefendants received reductions for cooperation; Turner did not cooperate with the government.[1] A difference justified by the fact that a codefendant assisted the government, whereas the defendant did not is not "unwarranted." *Bartlett*, 567 F.3d at 908. In addition, Turner was facing a first-degree murder charge; there is no indication that any of his codefendants were also charged with murder. The judge also noted that "[t]hey were different defendants" and he stated that he did not view the codefendants' sentences to be particularly out of line with Turner's sentence. The judge emphasized that "[e]ach must be judged on an individual basis."

As the court's explanation for the disparities between Turner's sentence and those of his codefendants reveals, the judge appears to have been merely making a preliminary remark when he stated that there were "unwar-

---

[1] Turner argues he was unable to cooperate because he was in state custody. Nothing in the record suggests that he offered to cooperate with the government.

ranted" disparities. The court's detailed explanation of the variances in the sentences which followed that initial comment shows that it believed the disparities were warranted. And the court explicitly stated that it had "considered the need to avoid unwarranted sentencing disparities among defendants with similar records." Even if the judge was under the mistaken impression that "a sentencing disparity is problematic only if it is between the defendant's sentence and the sentences imposed on other similarly situated defendants nation-wide," *Statham*, 581 F.3d at 556 (explaining that *Gall v. United States*, 552 U.S. 38 (2007) foreclosed such a rule), the sentencing transcript shows that the judge did, in fact, consider the sentencing disparities with Turner's codefendants. He simply concluded that the differences were warranted. We find no error in the court's consideration of the sentencing disparities.

### C. Substantive Reasonableness of Turner's Sentence

Turner contends that his sentence is substantively unreasonable and that the district court inadequately weighed the sentencing factors. A court must give meaningful consideration to the sentencing factors, but need not address every argument that a defendant makes at sentencing. *United States v. Carrillo-Esparza*, 590 F.3d 538, 540 (7th Cir. 2010) (per curiam); *see also Pulley*, 2010 WL 537574, at *5 ("The court is not required to consider every 'stock' argument, but it must address the defendant's principal arguments."). "An adequate statement of reasons why its sentence is appropriate and

consistent with § 3553(a) will suffice." *Carrillo-Esparza*, 590 F.3d at 540 (citing *United States v. Alden*, 527 F.3d 653, 662 (7th Cir. 2008)).

In arguing that his sentence is substantively unreasonable, Turner specifically cites the following: his desire to rehabilitate and avoid recidivism; his upbringing with a drug-using mother and drug-using and abusive father; his prior offenses occurred at a young age; his assertion that many of his offenses were "relatively minor in nature"; and the effect his incarceration has on his family, especially his minor children. Turner also claims that the court failed to consider the nature and circumstances of his offense, its seriousness, and the appropriate Guidelines range—in essence restating his earlier challenges to the court's factual findings. We have addressed these challenges above.

Regarding Turner's other claims, the record establishes that the sentencing court did consider Turner's arguments for leniency. The judge said that he considered the statement Turner made at the sentencing, the lawyers' arguments, the parties' sentencing memoranda, the PSR, and the transcripts of the trial, guilty pleas, and sentencings as related to Turner's codefendants. In particular, the judge noted that Turner claimed to have had some positive life changes, but found that Turner was at a high risk for recidivism. This risk was supported by the two jail violations Turner incurred while in custody based on the charges against him in this case.

The sentencing judge also examined the effect on Turner's family as well as his disadvantaged upbringing,

noting that these circumstances were no different than the average case and were "all too frequent." He considered Turner's age, twenty-six years at sentencing, and lack of parental direction, noting that he had been involved in criminal conduct since the age of fifteen. The judge also noted Turner's history of alcohol and drug abuse and behavioral problems and then described Turner's background as "all too typical." Furthermore, the judge took into account the fact that Turner had been given probation and other forms of leniency as a juvenile and adult, but persisted in his criminal ways. This history suggested to the judge that a longer sentence was necessary to serve the goals of just punishment and deterrence. And the judge found that the need to protect the public also weighed in favor of a within-Guidelines sentence.

As for Turner's prior offenses, the judge weighed his two prior convictions for selling controlled substances and the fact that he was a career offender. The judge said that Turner's traffic offenses were not minor traffic violations; Turner had been driving with a suspended license, which demonstrated to the court a disregard for the law and that Turner was not deterred by punishment. And the court noted that Turner always gave a false name when stopped for a traffic offense. The court considered that the conviction in this case, which was Turner's third for selling drugs, also involved guns and violence. The judge therefore concluded that Turner's background did not justify a variance from a career offender Guideline. And in doing so, the judge gave appropriate consideration to the seriousness of the

offense and the fact that Turner has persisted in his criminal conduct.

In the sentencing judge's view, none of the § 3553(a) factors weighed in Turner's favor and none justified a sentence reduction. We find no abuse of discretion here. The judge thoroughly considered the sentencing factors and more than adequately explained why the chosen sentence was appropriate. Turner has not rebutted the presumption that his within-Guidelines sentence was reasonable. *See Carrillo-Esparza*, 590 F.3d at 540.

### III. Conclusion

The sentence and judgment are AFFIRMED.