In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 10-3630 & 10-3652

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

RONALD L. SMITH and KEVIN BAKER,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:08-cr-01053—**Suzanne B. Conlon**, *Judge.*

ARGUED SEPTEMBER 16, 2011—DECIDED MARCH 21, 2012

Before EASTERBROOK, *Chief Judge*, and WOOD and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Ronald L. Smith and Kevin Baker were convicted of conspiracy to possess with intent to distribute and to distribute, and attempted possession of five kilograms of cocaine. Baker was also convicted of using a telephone in commission of the conspiracy. The defendants appeal the district court's denial of their motion for a new trial which was

based on the government's surprise disclosure of the identity of its confidential informant. Smith also appeals his sentence, arguing that the court based a three-level increase under U.S.S.G. § 3B1.1(b) only on unreliable testimony. Finding no error requiring remand, we affirm.

## I. Background

Smith and Baker were charged with drug-related crimes. Count One of the indictment alleged that beginning no later than in or about 2006 and continuing to at least December 6, 2008, they conspired to possess with intent to distribute and to distribute five kilograms or more of cocaine. 21 U.S.C. §§ 841(a)(1) & 846. Count Two alleged that on or about December 5, 2008, they attempted to possess with intent to distribute five kilograms or more of cocaine. 21 U.S.C. §§ 841(a)(1) & 846; 18 U.S.C. § 2. Count Three charged that on or about December 5, 2008, Baker used a telephone in commission of the conspiracy. 21 U.S.C. § 843(b).

Before trial, Smith moved for disclosure of the identity of all confidential informers, arguing that their identities were relevant and helpful to the adequate preparation of a defense. The government opposed the motion, invoking the confidential informant privilege. The government stated that if any of the confidential informants were to testify at trial, their identities would be disclosed. The district court denied the motion, concluding that Smith had not shown a need for disclosure sufficient to outweigh the public's interest in preserving the in-

formants' anonymity and encouraging citizens to report crimes.

At the jury trial in August 2010, the government alleged that Smith managed or supervised an operation in which various couriers, including Baker, transported drugs and money between Chicago, Illinois, and Columbus, Ohio. The government's evidence included the testimony of two participants in a drug organization run by twins Margarito and Pedro Flores, and co-operating witnesses Antonio Aguilera and Daniel Torres. The government also played recorded conversations allegedly between Smith and Baker and their supplier, a confidential source (CS), regarding the December 5, 2008, attempted drug transaction. The audiotapes of the recorded conversations had been made available to the defense in March 2009 and draft transcripts were provided around July 2010. Neither the recordings nor transcripts identified the CS by name. The government did not identify the CS in its opening statement, but referred to him as Smith's and Baker's "supplier." Nor did the government hint in its opening statement that it would disclose the CS's identity to the jury.

The government's first witness was Aguilera. He claimed that he picked up "thousands" of kilos of cocaine for the Flores brothers and delivered the cocaine, in 5-to-50-kilogram amounts, to their customers. He stated that each customer was directly tied to a specific area, that is, there was a specific area where he would deliver to each customer. And he explained his general practices and methods of delivery.

Aguilera testified that he first met Smith in 2006 when Aguilera delivered cocaine to Smith at the direction of the Flores brothers. On that occasion, Aguilera and Cesar Perez, who also worked for the Flores brothers, went to meet a customer and deliver cocaine. Perez introduced Smith to Aguilera as "Pit Bull" or "Bulldog." Smith gave Aguilera the keys to his vehicle and told him where it was located. Aguilera and Perez got the vehicle, a pewter GMC Tahoe with Ohio plates, from a parking garage and drove it to a stash house. At the stash house, Aguilera and Perez filled a secret, hidden compartment in the vehicle with as much cocaine as they could fit—15 kilos. They took the vehicle back to the parking garage, returned the keys to Smith, and told him where they had parked the vehicle.

Aguilera testified that about one week later, he met Smith again in the same area as the first meeting, near a Harley-Davidson store in downtown Chicago. The purpose was the same—to deliver narcotics. According to Aguilera, the Flores brothers instructed him to go to the area and meet the customer. Aguilera and Perez met Smith, got the keys to his vehicle, which was the same pewter GMC Tahoe or GMC Yukon[1] with Ohio plates, and got the vehicle from the same parking garage as on the previous occasion. Aguilera and Perez drove

_____

[1] Both the Chevy Tahoe and GMC Yukon are full-size sport utility vehicles made by GM. They are quite similar, with slight differences in trim and styling. The Yukon tends to carry a heftier price tag.

the SUV to the same stash house, opened the hidden compartment, removed the money inside, and loaded it with 15 kilos of cocaine. They put the money in a duffle bag and left it inside the stash house. Then they returned the SUV to the area near the Harley-Davidson store and parked it. Aguilera testified that when he returned the keys to Smith, Smith said "he didn't want to come down to pick it up anymore," which meant "he didn't want to drive to Chicago" anymore and "he might be sending a nurse down to pick up the stuff." After that second meeting, Aguilera did not see Smith again until the trial.

A few weeks later, Aguilera, again acting on instructions from the Flores brothers, returned to the same area near the Harley-Davidson store "to drop off and pick up." Aguilera stated that he met with a female who gave him the keys to the same pewter GMC Yukon with Ohio plates and told him where it was located. As before, Aguilera drove the vehicle to the stash house, removed the money from inside the hidden compartment, loaded it with cocaine, and returned the SUV to the parking garage. Aguilera did not know the woman's name.

Sometime thereafter, perhaps two weeks or a month later, Aguilera met the same woman again in the same area near the Harley-Davidson store. This time she was accompanied by Baker. Margarito Flores had sent Aguilera to meet "[t]he guys from Ohio," pick up a vehicle, and unload it and load it. Baker gave Aguilera the keys to the same pewter GMC Yukon with Ohio

plates. As before, Aguilera drove the SUV to the stash house, unloaded the money from the hidden compartment, and loaded it with cocaine. He then returned the SUV and keys to Baker.

The next time Aguilera met Baker, Baker was driving a blue Nissan Xterra. Aguilera picked up Baker in front of his hotel and drove him to the parking garage downtown, where Aguilera loaded the Xterra with kilograms of cocaine. About one or two months earlier, the same woman accompanying Baker when Aguilera first met him had turned the Nissan Xterra over to Aguilera so he could install a hidden compartment; he then returned the vehicle to her. On two occasions in the summer of 2006, Aguilera delivered cocaine to a man who was driving either the pewter Yukon with Ohio plates or the Nissan Xterra with Ohio plates. Aguilera didn't know the man's name.

During its direct examination of Aguilera, the government sought to introduce into evidence photographs of the Flores brothers. The defense objected. The court addressed the objection outside the jury's presence. It was at that point that the government first disclosed that Pedro Flores was the CS in the recorded conversations.

The second day of trial, the government called Special Agent Matt McCarthy to testify and provide a foundation for the admission of the recorded conversations involving the CS. Agent McCarthy testified that on December 3, 2008, he was recording phone calls made by a cooperating individual. The prosecutor asked the agent for the name of the cooperating individual, and

the agent stated that it was Pedro Flores. Neither defendant objected to this identification at this time. The agent also testified that he made several recordings of telephone conversations made by Pedro Flores over the course of two or three days beginning on December 3.

The defendants moved for a mistrial on the ground that the CS's identity had been disclosed to the jury but had not been disclosed to the defense before trial. They argued the disclosure prejudiced them in terms of preparation and defense strategy. The government responded first, by erroneously stating that the defense had not sought disclosure of the CS's identity; second, by stating that it did not intend to call Pedro Flores as a witness; third, by arguing that Pedro's identity was offered to establish that the witnesses—Aguilera, Special Agent McCarthy, and Torres—were all referring to the same person; and fourth, that Pedro's statements were not being offered for their truth. The court effectively denied the motion and admitted the recorded conversations into evidence.

The audiotapes were played for the jury and corresponding transcripts also were made available. Before the audiotape recordings were played, however, the court gave a limiting instruction that the CS's statements were not to be considered for their truth, but "to place in context and help [the jurors] understand the statements that allegedly were made by defendants on the recordings." The recordings were of seven telephone calls Pedro Flores made to Smith and Baker between December 3 and 5. In the first six calls to Smith, Smith

arranged for the delivery of 20 to 25 kilograms of cocaine to be picked up by Baker in Chicago. During that conversation, Flores and Smith said things that suggested an existing drug relationship: Flores told Smith, for example, "I might give you a cheaper number to see if you move them a little faster," and "I'm gonna work it out with you and make you happy this time," to which Smith responded, "[Y]ou tell me that all the time man." In another conversation, Smith told Flores where Baker was staying in Chicago and gave him Baker's phone number so Flores could contact Baker directly. Flores told Smith to tell Baker that "Monkey is going to call him." Two minutes later, Flores called Baker who confirmed his location and that "the dude" (Smith) sent "the change." Flores advised that he was going to have "my boy Monkey" call Baker.

Then drug task force officer Mario Elias, acting in an undercover capacity as "Monkey," called Baker and arranged to meet in front of Baker's hotel. During that call, Baker confirmed that "Monkey" was going to "pick up and drop off." The agent drove to the hotel, met Baker, and the two drove their own vehicles to a parking garage. Baker gave the agent $260,190 in cash from a hidden compartment in his truck, and the agent gave Baker a bag containing fake cocaine. After Baker put the bag into the hidden compartment, Elias gave the signal and Baker was arrested.

In addition, government witness Torres, who testified that he picked up and delivered cocaine and money for the Flores brothers from late 2006 to 2008, stated that

he delivered cocaine to Baker about seven times. According to Torres, he met Baker in various parking garages located in an area in downtown Chicago. Torres said that Baker drove a blue Nissan Xterra with Ohio license plates and "a bigger Suburban Tahoe-type SUV of a grayish, pewter color." Torres stated that he would give Baker a duffle bag filled with cocaine or load the cocaine into the hidden compartments in Baker's vehicles. At times, Baker gave Torres money in exchange for the cocaine.

The jury convicted Smith and Baker of all charges against them. Following trial, the defendants moved for a new trial under Federal Rule of Criminal Procedure 33. Smith argued unfair surprise and prejudice resulting from the claimed tardy disclosure of the CS's identity as drug kingpin Pedro Flores. The district court found that the claim of surprise was "supported by the record." However, the court said: "The key question . . . under Rule 33 is not whether the prosecutors' conduct was fair or even candid, but rather whether pretrial disclosure would have changed the result. Prejudice sufficient to compel a different verdict has not been shown." Baker argued that had he known the CS's identity, his counsel would have addressed this unfavorable fact in opening statement. Baker asserted that his counsel lost credibility with the jury by referring to the CS merely "as someone acting at the government's direction." The district court found Baker's argument reasonable, but concluded that he did "not establish resulting prejudice sufficient to support a conclusion

that the jury's verdict would have been not guilty but for addressing the issue in opening statement." The court stated that the timing and manner of the disclosure of the CS's name "suggests a troubling degree of games-manship. A claim of unfairness is justifiable." Deciding that the defendants hadn't shown resulting prejudice or that a substantial right was jeopardized, the court ruled that the interests of justice did not require a new trial.

At sentencing the court gave Smith a three-level enhancement for his role in the offense, upon finding that he was a manager or supervisor and that the criminal activity involved five or more participants. U.S.S.G. § 3B1.1(b). The government had argued that the criminal activity involved six participants: Smith, Baker, Aguilera, Torres, and the two unidentified couriers. Smith argued the government failed to prove that the two unidentified couriers were participants and thus failed to establish five or more participants. The district court found that "[t]he couriers [Aguilera and Torres] while . . . their testimony about specific transactions and amounts lacked specificity or the indicia of reliability, their testi-mony about how things operated was corroborated and did establish there were other couriers and other people involved, including [themselves]." The court therefore found a basis for applying the three-level enhancement: "Viewing the evidence in a light most favorable to the Government, Mr. Smith supervised Mr. Baker in a con-spiracy involving five or more persons." Smith was sentenced to 14 years; Baker was given the statutory minimum of 10 years.

The defendants argue that the district court erred in denying their motions for a new trial because they showed prejudice by the government's improper surprise disclosure of the CS's identity to the jury. They assert that in ruling on their motions, the court applied the wrong legal standard—that they had not shown prejudice sufficient to compel a different verdict. Smith also argues that the court clearly erred in giving him a three-level increase under U.S.S.G. § 3B1.1(b) for his role in the offense as a manager or supervisor of a criminal activity involving five or more participants.

## II. Discussion

Rule 33 provides that "the court may . . . grant a new trial if the interest of justice so requires." We review the denial of a motion for a new trial under Rule 33 for an abuse of discretion. *United States v. Boender*, 649 F.3d 650, 654 (7th Cir. 2011). "The district court abuses its discretion when it makes an error of law or when it makes a clearly erroneous finding of fact." *United States v. Freeman*, 650 F.3d 673, 678-79 (7th Cir. 2011).

We review a district court's findings regarding role in the offense for clear error and vacate only if "we are left with the definite and firm conviction that a mistake has been made." *United States v. Johnson*, 489 F.3d 794, 796 (7th Cir. 2007). "We defer to a district court's credibility finding, 'which can virtually never be clear error.'" *United States v. Turner*, 604 F.3d 381, 385 (7th Cir. 2010) (quoting *United States v. Pulley*, 601 F.3d 660, 661-62 (7th Cir. 2010)).

### A. Disclosure of the CS's Identity

The defendants contend that the prosecutor improperly disclosed the CS's identity at trial and the district court erred in denying their motion for a new trial based on that disclosure. When considering allegations of prosecutorial misconduct, we first determine whether the prosecutor's conduct was improper. *Freeman*, 650 F.3d at 683; *United States v. Moore*, 641 F.3d 812, 818 (7th Cir. 2011). If so, we evaluate the conduct in light of the entire record to determine if the conduct deprived the defendants of a fair trial. *Moore*, 641 F.3d at 818-19.

The government had no legal duty to disclose the CS's identity before trial. Smith had sought disclosure, and the government opposed it, claiming the informant's privilege; and the district court ruled in favor of the government. The defendants have not identified any specific disclosure obligation or other rule that was violated. Rather, they appeal to fundamental fairness, claiming that if the government is going to disclose the CS's identity to the jurors at trial, it should be required to disclose it to the defense before trial, and if the government is going to withhold the CS's identity from the defense before trial, then it shouldn't be allowed to use it at trial. The defendants assert that the prosecutor has a duty to ensure that a defendant receives a fair trial, *see, e.g., Berger v. United States*, 295 U.S. 78, 88 (1935) (a prosecutor's "interest . . . is not that it shall win a case, but that justice shall be done"); *Freeman*, 650 F.3d at 680 ("A prosecutor has a special duty . . . to assure that defendants receive fair trials."

(quotation and citation omitted)), which is true. However, "[t]he ultimate question is whether the comment 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Moore*, 641 F.3d at 819 (quoting *United States v. Hale*, 448 F.3d 971, 986 (7th Cir. 2006)); *see also Freeman*, 650 F.3d at 683.

The district court did not make an explicit finding that the prosecutor's conduct was improper, but characterized the disclosure of Pedro Flores's name as "tardy," a "surprise," and something that "suggests a troubling degree of gamesmanship" and made a "claim of unfairness . . . justifiable." We are equally critical of the way the government hid behind the informant's privilege leading up to trial and then sprung the CS's identity on the defense and jury mid-trial. At oral argument the government did not offer a good explanation for why it proceeded in this way. It seems to us that the district court treated the disclosure as improper conduct. And we, too, shall do the same. But a prosecutor's improper conduct alone is not sufficient to warrant a new trial.

We evaluate "whether the improprieties impacted the outcome of the trial, and we will reverse only if there is a reasonable probability that, in the absence of the improprieties, the defendant would have been acquitted." *United States v. McGee*, 408 F.3d 966, 984 (7th Cir. 2005) (citing *United States v. Boyd*, 55 F.3d 239, 241 (7th Cir. 1995)); *see also Freeman*, 650 F.3d at 681 (framing the standard for a new trial as "whether the district court clearly erred when it determined that there was any reasonable likelihood that [the improper conduct]

affected the verdict"). It is here that the district court made a misstep. It thought the decision to grant a new trial turned on whether "pretrial disclosure *would have changed the result.*"[2] Missing from the formulation used by the district court is the "reasonable probability" or "reasonable likelihood" language that is required. *See, e.g.*, *McGee*, 408 F.3d at 984. Thus, the court applied the wrong, and a heightened, legal standard in denying the motions for a new trial. *See Stanley v. Bartley*, 465 F.3d 810, 813 (7th Cir. 2006) ("To show a reasonable probability of a different outcome is a less demanding burden than to show that the outcome *would* have been different."); *cf. United States v. Williams*, 81 F.3d 1434, 1440 (7th Cir. 1996) (reviewing district court's denial of a motion for new trial and differentiating having to show "a 'reasonable probability of a different result'" with having to show that the defendants "would in fact have been acquitted"). Although application of the wrong standard may require a remand in some cases, it is not required here because even under the correct, more lenient standard, the defendants are entitled to no relief. We are convinced that the government's disclosure of the CS's identity did not so infect the trial with unfairness as to deprive the defendants of due process.

---

[2] The district court also considered whether Smith made a showing "sufficient to compel a different result" and whether Baker made a showing "sufficient to support a conclusion that the jury's verdict would have been not guilty but for [the improper conduct]."

Any effect that the government's disclosure that the CS was Pedro Flores may have had on the verdict was insignificant. The government's evidence of the defendants' guilt, including Aguilera's testimony about his dealings with Smith and Baker, Torres's testimony about his cocaine transactions with Baker, the audiotape recordings in which Smith arranged with the CS for the delivery of cocaine to Baker, and Baker's appearance at the contemplated cocaine transaction with $260,190 and a vehicle equipped with a hidden compartment, was overwhelming. There is no reasonable probability that the trial's outcome would have been different absent the disclosure. Thus, the district court did not abuse its discretion in denying the defendants' motion for a new trial.

In addition, the defendants knew from the government's pretrial disclosures that it alleged they were involved as customers in a drug trafficking organization run by the Flores brothers. The defendants also knew of the CS's existence: The government provided them with the audiotapes of the recorded conversations long before trial; the transcripts were provided before trial as well. In one recorded conversation, Smith acknowledges a past relationship with the CS, saying he had been trying to get in touch since the weekend; and when the source says that he will "work it out" and "make you happy this time," Smith says "you tell me that all the time man." The defendants should have been able to discern the CS's identity based on the recorded conversations. This, of course, assumes that Smith was the other participant in six of the conversations. He

disputes that he was, but the jury apparently believed that he was the speaker. Baker does not contest that he was the person speaking with the CS in one of the recorded conversations. Baker should have known the identity of the person with whom he was speaking less than two hours before his arrest.

Even if the defendants didn't know the CS's identity, they should have known that the CS was their supplier. In one conversation, the CS told Smith that he would send him "like 20, 25. . . I'll get them together today," that he "might give [Smith] a little cheaper number . . . see maybe if [Smith] can move them a little faster," which at the very least suggests the CS's role is that of a drug supplier. There can be no question that the defendants knew the charges against them included a cocaine conspiracy and attempted possession of cocaine on December 5, 2008. They had the transcripts that reflected that the recorded calls occurred from December 3 to 5. Given this information, they should have understood in advance of trial that the CS was their supplier. And that's not all. In opening statement, the government repeatedly referred to the cooperating source as the defendants' supplier and stated in reference to and leading up to the December 5, 2008, transaction that Smith had spoken by phone with "his supplier."

Furthermore, Baker's defense was that he didn't know he was in the middle of a drug transaction. Smith defended on the ground that the voice on the recorded conversations was not his. The district court offered the defense an opportunity to articulate, outside the gov-

ernment's presence, how the disclosure affected their trial strategy. The court also offered the defendants a brief recess of a day or so to prepare their defense in response to the disclosure, but they didn't take the court up on its offer. All of this strongly suggests that the defendants have not shown prejudice due to the disclosure. *See Moore*, 641 F.3d at 821 (the defendant's "failure to assert a need for a cautionary instruction directly following the [alleged improper question about gang affiliation], or at the close of evidence, in spite of the court's clear willingness to consider it, undermines his current argument that any comment or reference regarding gang affiliation" denied him due process); *United States v. Mathur*, 624 F.3d 498, 506 (1st Cir. 2010) (defendant showed no prejudice from belated disclosure of alleged *Brady* materials where defendant identified no "plausible strategic option that the delayed disclosure hampered or foreclosed," he was not prevented from asserting his defense theories at trial, and he rejected the court's offer of a continuance); *see also United States v. Cruz-Velasco*, 224 F.3d 654, 665 (7th Cir. 2000) (stating that a "new trial is warranted for a discovery violation only if the remedy offered by the district court was inadequate to provide the defendant with a fair trial") (quotation omitted).

Smith and Baker argue that they did not request a delay at the close of the government's evidence because at that point there was nothing they could do to mitigate the damage that had already been done. They assert prejudice because their counsel allegedly lost credibility

with the jury by failing to address in opening state-
ments that Pedro Flores was the speaker in the
recorded conversations. But they have not indicated
how they would have addressed the fact that the CS
was Pedro Flores. And they have not asserted that
their defense theories would have been different had
they only known the government would disclose the
CS's identity. We do not see how knowledge that the
CS was Pedro Flores would have changed the defense
theories or could have impacted those theories. Nor can
we tell how such knowledge would have caused the
defense to conduct further investigation, call witnesses,
or present evidence.

The defendants allege that their Sixth Amendment
right to effective assistance of counsel is implicated. The
harmlessness of the disclosure leads to the conclusion
that there was no prejudice for purposes of the right
to counsel. *See Strickland v. Washington*, 466 U.S. 668, 687
(1984). The district court did not abuse its discretion
in denying the defendants' motion for a new trial based on
the government's disclosure of the CS's identity at trial.

### B.  U.S.S.G. § 3B1.1(b) Adjustment

Smith challenges the three-level adjustment under
U.S.S.G. § 3B1.1(b), specifically whether the criminal
activity involved five or more participants. He argues
that the district court's finding that the two unnamed
couriers were participants was based only on Aguilera's
unreliable testimony. In reviewing Smith's sentence, "we

must 'ensure that the district court committed no sig-nificant procedural error, such as . . . selecting a sentence based on clearly erroneous facts . . . .'" *United States v. Halliday*, No. 10-2337, 2012 WL 447450, at *7 (7th Cir. Feb. 14, 2012) (quoting *United States v. Abbas*, 560 F.3d 660, 666 (7th Cir. 2009)); *see also Gall v. United States*, 552 U.S. 38, 51 (2007).

A sentence should be based on "information that has sufficient indicia of reliability to support its probable accuracy." *Johnson*, 489 F.3d at 797 (quotation omitted). "Indicia of reliability" may come from, *inter alia*, the provision of facts and details, *id.* at 798, corroboration by or consistency with other evidence, *see United States v. Schaefer*, 291 F.3d 932, 942 (7th Cir. 2002), or the opportu-nity for cross-examination, *see United States v. Hankton*, 432 F.3d 779, 793 (7th Cir. 2005). The requirement of reliable evidence, however, is a limitation on the court's consideration of hearsay and other "evidence with uncer-tain provenance." *United States v. Torres-Ramirez*, 213 F.3d 978, 980 (7th Cir. 2000); *see also* U.S.S.G. § 6A1.3(a). An appellate court may not disregard a district court's decision to believe a witness testifying under oath— "unless the testimony is illogical or contradicted by documents or other physical evidence, making it clearly erroneous to accept the witness's version of events." *Torres-Ramirez*, 213 F.3d at 980-81; *see also Hankton*, 432 F.3d at 791 (a judge's finding that a witness is credible bolsters the judge's finding that the wit-ness's testimony is reliable).

Smith argues that *United States v. Johnson*, 999 F.2d 1192 (7th Cir. 1993), mandates that we vacate the three-level

increase. There, as here, the defendant argued that the district court erred in enhancing his sentence under U.S.S.G. § 3B1.1(b), claiming the evidence was insufficient to support the finding as to the number of participants. The district court relied on an agent's trial testimony that an informant reported that the defendant used ten to fifteen teenagers to distribute crack. The informant never identified any of the teenagers. The informant's statement was the only evidence offered to prove that the defendant was a supervisor or manager of at least five participants. There was evidence that the informant was not always reliable and tended to exaggerate and "[t]here was expert testimony that the defendant was a schizophrenic and not capable of directing or managing a large scale operation." *Id.* at 1197. We remanded for a further finding on the enhancement. *Id.* at 1198.

Like the informant in *Johnson*, Aguilera never identified the male and female couriers, Aguilera's testimony was the only evidence of their participation on which the government relied, and Aguilera has been judged unreliable in certain respects. But this is where the similarities end. Aguilera's testimony wasn't hearsay. He testified at trial and was subject to thorough cross-examination. The sentencing judge was the trial judge and had the opportunity to hear Aguilera's testimony and observe his demeanor and manner while testifying. On top of that, no evidence suggested that Smith was incapable of managing or supervising five or more participants. Given these differences, *Johnson* doesn't require that we find Aguilera's testimony about the

unnamed couriers too unreliable to support the district court's sentencing finding.

Smith also relies on *United States v. Acosta*, 85 F.3d 275 (7th Cir. 1996), for the proposition that "evidence that is contradictory on its face is perhaps the prototype of unreliable evidence, and . . . [provides] an inadequate basis for calculating a defendant's base offense level under the Guidelines." *Id.* at 283. In *Acosta*, the government relied on a witness's trial testimony to establish the total drug quantity attributable to the defendant. The witness testified that he made between 30 and 50 cocaine purchases from the defendant. He also testified first that the smallest amount of cocaine he obtained from the defendant at one time was between a half ounce and a kilogram of cocaine, but then claimed that nine ounces was the smallest amount. *Id.* at 278. The district court calculated the drug quantity by multiplying the number of cocaine purchases by the quantity the judge thought was the smallest amount Johnson got in a single transaction, an acceptable way of estimating the quantity. *Id.* at 282. But the judge gave no explanation why he believed that nine ounces was the smallest amount purchased. *Id.* The problem was that the judge relied on "one of two contradictory statements offered by a single witness" but did not "directly address the contradiction and explain why [he] credit[ed] one statement rather than the other." *Id.* (quotation omitted).

Here, however, the district court didn't rely on contradictory testimony in finding that the unnamed couriers were participants in the criminal activity: Smith acknowl-

edges that the contradictory testimony concerned the time line of his alleged meetings with the unnamed woman and the other participants and Baker's role in the drug operation. The district court did not rely on the time line in finding five or more participants, and Smith doesn't dispute that Baker was a participant, whatever his role may have been. Furthermore, Aguilera's testimony that he met Smith in approximately December 2006 was in response to a leading question which was put to him following a short break in trial. He previously testified that he met Smith "in approximately 2006." If the first meeting with Smith occurred "approximately 2006," and not in "December 2006," then Aguilera's testimony about when he met with Smith, Baker, and the unnamed couriers is not necessarily contradictory.

According to Smith, Aguilera's contradictory testimony about Baker's role in the drug operation underscores the unreliability of his testimony about the unnamed couriers. It is true that Aguilera's grand jury testimony and trial testimony conflicted with respect to Baker's role. Before the grand jury, Aguilera identified a photograph of Baker but described the role of another person who, like Baker, Aguilera referred to as "Old Boy." The contradiction was explored both by the government on direct examination and on cross-examination. The district court at sentencing noted that Aguilera misidentified Baker twice as a Chicago-based dealer and "changed his tune about a month before trial." However, concerns with Aguilera's testimony about Baker become less troubling given Torres's testimony that he, too, delivered cocaine for the Flores

brothers and specifically to Baker who drove a blue Nissan Xterra or a gray, pewter-colored Tahoe-type SUV—the very same vehicles used by Smith and the unidentified couriers. Moreover, the undisputed evidence of Baker's presence and conduct at the December 5 meeting supports Aguilera's trial testimony as to Baker's role in the drug operation.

Smith also asserts that Aguilera's testimony was not his own. He complains that the government asked several leading questions and about the "remarkable similarity" between Aguilera's testimony and Torres's testimony. The government did ask several leading questions of Aguilera, but they did not concern the identity of the unnamed couriers. And although Aguilera's and Torres's claims about the amount of cocaine they distributed was similar, that criticism doesn't apply to Aguilera's testimony about the unidentified couriers, which Smith says was uncorroborated. At sentencing, when considering U.S.S.G. § 3B1.1(b), the district court asked the government if it was relying on the testimony of Aguilera and Torres. The government responded that it was relying on "the testimony of Mr. Aguilera as to the participation of the two unidentified workers of Mr. Smith[.]"

Finally, Smith argues that Aguilera's unreliability as to drug quantity shows his unreliability concerning the unidentified couriers. A sentencing court may credit some portions of a witness's testimony while disregarding others. *See United States v. Hollins*, 498 F.3d 622, 630 (7th Cir. 2007) (holding district court did not err at

sentencing in crediting certain portions of a drug courier's testimony and discrediting other portions where the court observed the testimony and judged the courier's veracity); *cf. United States v. Erazo*, 628 F.3d 608, 612 (D.C. Cir. 2011) (holding sentencing court did not clearly err in finding that one portion of co-defendant's testimony was credible while finding other portions incredible). In finding that Aguilera's and Torres's testimony as to the amount of cocaine distributed to Smith and/or Baker was unreliable, the district court contrasted that testimony with other aspects of their testimony:

> [T]he numbers they came up with were inflamed or speculative. I mean, they just seemed to have no nothing, no explanation for the amounts they came out with, and it was vague testimony, not corroborated by anything. *Unlike some of the aspects of their testimony in terms of contacts and methodology of delivery, yes, that provided evidence a jury could base its verdict on . . . ."*

(Emphasis added.) Thus, the district court did not find Aguilera's testimony unreliable in toto.

Instead, the judge carefully considered his testimony, rejecting only the specific aspects she found unreliable, while accepting those aspects she found reliable. The judge found that Aguilera's testimony about the two unidentified couriers fell into the latter category. She said that "while . . . [Aguilera's and Torres's] testimony about specific transactions and amounts lacked specificity or the indicia of reliability, their testimony about how things operated was corroborated and did establish

there were other couriers and other people involved[.]" It is unclear precisely what the district judge meant in saying that "their testimony . . . was corroborated" and established the involvement of other couriers, given the government's assertion that it was relying on only Aguilera's testimony as to the two unidentified couriers.[3]

But even if the district court erred in finding that Aguilera's testimony about the other couriers was corroborated, or at least erred in relying on that corroboration when the government didn't assert it, remand is not required. Corroboration is not the only indicia of reliability. Sufficient indicia of reliability may come from the provision of facts and details, *Johnson*, 489 F.3d at 798, or the opportunity for cross-examination, *Hankton*, 432 F.3d at 793. The district court heard Aguilera's testimony and all the other trial testimony. Aguilera was personally involved with Smith, Baker, and the two

---

[3] The record would establish, however, that Torres's testimony lent some corroboration for Aguilera's testimony about the other couriers. Torres was asked: "[Y]ou also told the government that whoever it was who was picking up from Ohio [whom Torres identified as Baker], that there were a number of different drivers, correct?" Torres answered, "Yes." It seems that the government gave too much away in relying only on Aguilera's testimony to establish the participation of the two other couriers. The district judge was not mistaken in finding that Aguilera's testimony about the other couriers was corroborated. Yet the government has not argued that Aguilera's testimony about the two couriers was corroborated.

unidentified couriers. Although Aguilera didn't know the other couriers' names and provided no physical description of them (he wasn't asked for one), he did provide some details about his contacts with them. He testified as to where he met the female courier (in the same area where he met Smith), the vehicles they used—the same SUVs used by Smith and Baker, and the common method of delivery as to the woman. Much of Aguilera's testimony was corroborated: the vehicles the couriers used, the type of location where the drug transactions took place, and methods of delivery. Torres testified that he delivered cocaine to Baker in parking garages in downtown Chicago and that Baker drove a gray or pewter Tahoe-type SUV and a blue Nissan Xterra. And the December 5 attempted transaction was arranged and conducted in a way consistent with Aguilera's description of how he made his deliveries generally.

Furthermore, Aguilera was subjected to a thorough cross-examination. The sentencing judge presided over the trial, sorted through Aguilera's testimony, and decided which aspects were reliable and could be credited, and which could not. The judge did not clearly err in finding Aguilera's testimony about the involvement of the two unidentified couriers sufficiently reliable to support the sentencing enhancement. Therefore, we uphold the district court's finding that Smith's criminal activity involved five or more participants and its application of U.S.S.G. § 3B1.1(b).

### III.  Conclusion

The district court's judgments are AFFIRMED.