In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 11-1313, 11-1323, 11-2057,
    11-2061, 11-2062 & 11-2071

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

AARON M. DAVIS, BOBBY SUGGS,
WILLIAM J. DAVISON, SEANTAI SUGGS,
TERRAUN PRICE, TERENCE DILWORTH,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Indiana, Hammond Division.
Nos. 2:01-CR-00098 & 2:02-CR-00044–**James T. Moody**, *Judge.*

ARGUED JANUARY 20, 2012—DECIDED MAY 31, 2012

Before FLAUM and ROVNER, *Circuit Judges*, and
CASTILLO, *District Judge.**

* The Honorable Ruben Castillo, United States District Court
for the Northern District of Illinois, sitting by designation.

CASTILLO, *District Judge.* This is a consolidated appeal of the denial of six defendants' motions to reduce their sentences pursuant to 18 U.S.C. § 3582(c)(2) based on the retroactive crack cocaine amendments to the United States Sentencing Guidelines. Defendants raise a number of challenges on appeal. For the reasons discussed below, we affirm the judgments entered by the district court.

## I. BACKGROUND

Bobby Suggs, Aaron Davis, Seantai Suggs, Terraun Price, Terence Dilworth, and William Davison were all members of the Concord Affiliated ("CCA") street gang in Gary, Indiana. From 1994 until 2001, CCA street gang members conspired to distribute crack cocaine and other drugs in the Concord neighborhood of Gary. *United States v. Suggs*, 374 F.3d 508, 512 (7th Cir. 2004); *United States v. Price*, 418 F.3d 771, 775 (7th Cir. 2005).[1] The drug trafficking occurred near a government housing complex known as "the Hill." *Suggs*, 374 F.3d at 508; *Price*, 418 F.3d at 775. The conspiracy eventually came to be led by Bobby, who obtained kilogram quantities of powder cocaine from Tomas Unzueta. *Suggs*, 374 F.3d at 508; *Price*, 418 F.3d at 775. Bobby and his co-conspirators

---

[1] The full background of the conspiracy may be found in our prior opinions in *United States v. Suggs*, 374 F.3d 508 (7th Cir. 2004) and *United States v. Price*, 418 F.3d 771 (7th Cir. 2005). Here, we only summarize those facts that are relevant to the defendants' § 3582(c)(2) motions.

converted the powder cocaine into crack cocaine, which was then distributed to trusted associates. *Suggs*, 374 F.3d at 508. Those trusted associates then distributed the crack cocaine to others or directly sold the crack cocaine to customers. *Id.*

The convictions of Bobby, Davis, Seantai, and Price stem from an 18-person, 33-count superseding indictment for conspiracy and distribution of crack cocaine returned by a grand jury in 2001. The convictions of Dilworth and Davison stem from a 6-person, 14-count indictment for conspiracy and distribution of crack cocaine returned by a grand jury in 2002.

In July 2002, Bobby, Davis, and Seantai proceeded to a jury trial and were convicted on all counts. Bobby, Davis, and Seantai were each convicted of one count of conspiracy to distribute crack cocaine in violation of 21 U.S.C. § 846 and 18 U.S.C. § 2, in addition to other related drug offenses. At sentencing, the district court concluded that each was responsible for distributing in excess of 1.5 kilograms of crack cocaine. In late 2002, the district court sentenced Bobby and Seantai to life imprisonment. In early 2003, the district court sentenced Davis to 405 months' imprisonment.

On March 31, 2003, Price, Dilworth, and Davison proceeded to a jury trial. On April 9, 2003, the jury found Price and Dilworth guilty of conspiracy to distribute crack cocaine in violation of 21 U.S.C. § 846 and 18 U.S.C. § 2, and found Davison not guilty of this count. The jury also convicted Dilworth and Davison of two counts of distribution of crack cocaine in violation of 21 U.S.C.

§ 841(a)(1). Price was also convicted of one count of use of a communications facility for the distribution of crack cocaine in violation of 21 U.S.C. § 843(b) and 18 U.S.C. § 2. At sentencing, the district court concluded that each was responsible for distributing in excess of 1.5 kilograms of crack cocaine. In October 2003, the district court sentenced Price to life imprisonment, and Dilworth and Davison to 360 months' imprisonment.

We later affirmed the convictions of each defendant. *Suggs*, 374 F.3d at 521; *Price*, 418 F.3d at 788. Bobby, Davis, and Seantai did not appeal their sentences, *Suggs*, 374 F.3d at 511, while Price, Dilworth, and Davison appealed their sentences. *Price*, 418 F.3d at 775. Because Price, Dilworth, and Davison were sentenced prior to the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), we ordered a limited remand in accordance with the procedure set forth in *United States v. Paladino*, 401 F.3d 471, 483-84 (7th Cir. 2005). We asked the district court to determine whether it would have imposed a different sentence on Price, Dilworth, and Davison had it understood the Guidelines to be advisory. *Price*, 418 F.3d at 786-88. The district court responded that it would have imposed the same sentences, and we then affirmed those sentences in separate opinions. *United States v. Price*, 155 Fed. Appx. 899, 2005 WL 3113458 (7th Cir. 2005); *United States v. Dilworth*, 168 Fed. Appx. 89, 2006 WL 279062 (7th Cir. 2006); *United States v. Davison*, 166 Fed. Appx. 246, 2006 WL 314463 (7th Cir. 2006).

In late 2007, the United States Sentencing Commission adopted Amendment 706, which lowered the base

offense level for crack cocaine offenses by two levels to alleviate problems associated with the penalty structure commonly known as the "100-to-1 drug-quantity ratio" between crack cocaine and powder cocaine offenses as found in § 2D1.1 of the United States Sentencing Guidelines. United States Sentencing Commission, Guidelines Manual, App. C, 226-231 (Nov. 2011) (Amendment 706) (USSG). Amendment 706, subsequently fine-tuned by Amendments 711 and 715, was made retroactive by the Sentencing Commission via Amendment 713. USSG App. C, 241-244 (Nov. 2011) (Amendments 711, 713, 715). At the time defendants were sentenced, offenses involving 1.5 kilograms or more of crack cocaine were assigned the highest possible base offense level of 38. USSG § 2D1.1(c) (Nov. 2002). As a result of Amendment 706, only offenses involving 4.5 kilograms or more of crack cocaine are assigned an offense level of 38, whereas offenses involving between 1.5 kilograms and 4.5 kilograms of crack cocaine are assigned a base offense level of 36.[2] *See* USSG § 2D1.1(c) (2007); *United States v. Hall*,

---

[2] In late 2010, the Sentencing Commission again revised the base offense levels for crack cocaine offenses via Amendment 748, which implemented "the emergency directive in section 8 of the Fair Sentencing Act of 2010." USSG App. C, 381 (Nov. 2011) (Amendment 748). Effective November 1, 2010, a base offense level of 38 is applied if the amount of crack cocaine involved is 8.4 kilograms or more; a base offense level of 36 is applied if the amount of crack cocaine involved is between 2.8 kilograms and 8.4 kilograms; and a base offense level of 34 is applied if the amount of crack cocaine involved is

(continued...)

582 F.3d 816, 817 (7th Cir. 2009) (hereinafter "*Mark Hall*"). After the enactment of Amendment 706, each defendant filed a motion to reduce his sentence pursuant to § 3582(c)(2). Section 3582(c)(2) allows "a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission" to move for a reduction in his sentence. 18 U.S.C. § 3582(c)(2).

We commend the district court for the procedure it followed. The district court appointed counsel in connection with each defendants' § 3582(c)(2) motions, and probation prepared new reports as to each defendants' request for a reduced sentence. After considering each defendants' request for a sentence modification, the district court prepared written orders detailing the basis of its decision.

Each addendum to the defendants' presentence investigation reports ("PSRs"), with the exception of Davison's, concluded that Amendment 706 did not impact their sentences because they were each responsible for more than 4.5 kilograms of crack cocaine. As to Davison, the 2008 addendum to his PSR advised that his base offense level should be reduced by two levels because he was responsible for more than 1.5 kilograms of crack cocaine but less than 4.5 kilograms, yielding a lower Guideline range. In separate rulings,

---

[2] (...continued)
between 840 grams and 2.8 kilograms. USSG § 2D1.1(c) (Nov. 2011).

the district court denied each defendants' § 3582(c)(2) motions.

### A. Bobby Suggs

Bobby's original PSR established that he was the leader of the CCA street gang and that from at least 1996 until the summer of 2001, the conspiracy distributed "in far excess of 1.5 kilograms of crack cocaine." The PSR reported that Bobby received kilogram quantities of cocaine from certain suppliers, which was converted to crack cocaine. He then distributed the crack cocaine to select members of the CCA street gang, including Davis, Seantai, and Dilworth, who in turn distributed the crack cocaine to other CCA street gang members. For sentencing purposes, the PSR advised that Bobby could be held responsible for at least 17.1 kilograms of crack cocaine. This amount was established by statements from Unzueta estimating that he delivered seven kilograms[3] of powder cocaine to Bobby, which converts to 6.2 kilograms of crack cocaine.[4] Unzueta also indicated that he supplied Anthony Evans, known to have assisted

---

[3] An earlier paragraph of the PSR noted that at Bobby's trial, Unzueta testified that he delivered 10 to 15 kilograms of powder cocaine to Bobby. The record is not clear as to why the PSR only relied upon seven kilograms of powder cocaine to calculate the total amount of crack cocaine for which Bobby could be held responsible. Due to the quantities involved, however, this difference is immaterial to our analysis.

[4] One kilogram of pure powder cocaine is equivalent to 890 grams of crack cocaine.

Bobby in obtaining kilogram quantities of cocaine and with cooking powder cocaine, with at least 12 kilograms of powder cocaine, which converts to 10.68 kilograms of crack cocaine. The PSR also advised that Bobby could be held responsible for an additional 28.34 grams of crack cocaine, and 177 grams of crack cocaine that the FBI recovered from the CCA street gang. These amounts add up to approximately 17.1 kilograms of crack cocaine, resulting in a base offense level of 38. Additionally, the PSR recommended a two-level enhancement because the FBI recovered approximately 41 weapons from the CCA street gang, 11 of which were traced to Bobby and Seantai. Bobby also received a four-level enhancement because of his role as the leader of the CCA street gang, and a two-level enhancement for obstructing proceedings. Bobby's total offense level was 46, and when combined with his criminal history category of II, his Guideline range for imprisonment was life. The district court sentenced Bobby to life imprisonment.

In connection with Bobby's motion for a reduced sentence, probation submitted an addendum to the PSR informing the district court that Bobby was not eligible for a sentence reduction because his criminal activity involved the distribution of more than 4.5 kilograms of crack cocaine. The district court denied Bobby's motion after concluding that it lacked statutory authority and jurisdiction to reduce his sentence because his Guideline range had not been lowered as a result of Amendment 706.

### B. Aaron Davis

Davis' PSR indicated that he was one of Bobby's top lieutenants. In that role, Bobby relied, in part, on Davis to distribute crack cocaine to the street sellers. The PSR reported that Davis supplied others with cocaine to sell on "the Hill" as early as 1994, and that in 1998, the FBI made a series of controlled buys of five grams or more of crack cocaine from Davis and Seantai. The PSR further noted that Michael Carter, a co-conspirator, told investigators that Davis moved to Indianapolis in 1997, but that after this move Davis continued to travel between Gary and Indianapolis and continued to sell cocaine to Carter. For sentencing purposes, the PSR advised that Davis could be held responsible for the distribution of at least 19.8 kilograms of crack cocaine. This amount was established by statements from Unzueta estimating that he delivered 10 to 15 kilograms of powder cocaine to Bobby, which converts to 8.9 kilograms of crack cocaine,[5] and that he supplied Evans with

---

[5] As noted above, although Bobby's PSR advised that Unzueta testified at Bobby's trial that he had delivered 10 to 15 kilograms of powder cocaine to Bobby, Bobby's PSR only took into account seven kilograms of this amount when calculating the total amount of crack cocaine for which Bobby could be held responsible. The record is unclear as to why Davis' PSR relied on the 10 to 15 kilogram quantity of powder cocaine, as opposed to seven kilograms of powder cocaine, in calculating the total amount of crack cocaine for which Davis could be held responsible. Even if Davis were only held responsible

(continued...)

at least 12 kilograms of powder cocaine. The PSR also advised that Davis could be held responsible for an additional 28.34 grams of crack cocaine, and 177 grams of crack cocaine that the FBI recovered from the CCA street gang. These amounts add up to approximately 19.8 kilograms of crack cocaine, yielding a base offense level of 38. Because one of the 41 weapons the FBI recovered from the CCA street gang was recovered from Davis' residence, the PSR recommended a two-level enhancement. The PSR also recommended a three-level enhancement for Davis' role as a top lieutenant of the CCA street gang, for a total offense level of 43. The PSR also advised that Davis had a criminal history category of II.

In a 2003 addendum to the PSR, Davis lodged a number of objections. Both the government and Davis objected to the leadership enhancement citing insufficient evidence for the enhancement. The district court adopted both of their positions. Davis also objected to the drug quantity findings and base offense level in the PSR, contending that the government had not established that 19.8 kilograms of crack cocaine was foreseeable to him and within the scope of his agreement. The district court rejected Davis' position and adopted the government's and probation's position as it concerned the base offense level. In finding that Davis was responsible for more than

---

[5] (...continued)
for seven kilograms of powder cocaine that Unzueta delivered to Bobby, this amount converts to 6.2 kilograms of crack cocaine, and therefore the difference is not material to our analysis.

1.5 kilograms of crack cocaine at his original sentencing hearing, the district court stated:

> It's this Court's judgment that based upon a preponderance of all of the evidence that it has in front of it including all of the . . . evidence that has been introduced at this hearing, that certainly it was reasonably foreseeable to [Davis] as a close associate of the leader of this drug conspiracy, Bobby Suggs, that more than 1.5 kilograms of crack cocaine base was involved. More likely than not, it's the 19.8 kilograms of crack cocaine that was involved that could be attributable to [Davis], but certainly at a minimum 1.5 kilograms of crack cocaine is attributable to [Davis.]

In the 2003 addendum, Davis further argued that his involvement in the conspiracy was limited to the time period between 1996 and 1998. The government, on the other hand, contended that it had proved at trial that Davis remained a member of the conspiracy through at least February 2001. According to the government and probation, Davis' membership in the conspiracy was established through recorded telephone conversations between Bobby and him in February 2001 and through a letter he received in February 2001 from Lonnie Carson, a co-conspirator. Additionally, the government and probation asserted that Davis had assisted Bobby's attempt to evade arrest in May 2001. In the 2003 addendum, the district court adopted both the government's and probation's position as to these objections. Ultimately, the district court adopted the factual findings and Guideline application in Davis' PSR, with the exception of

the PSR's recommendation that Davis' base offense level be increased by three levels for his role in the offense. Accordingly, Davis' base offense level remained 38, but he only received a two-level firearms enhancement, culminating in a total offense level of 40. Davis' total offense level combined with a criminal history category of II yielded a Guidelines range of 324 to 405 months' imprisonment. The district court sentenced him to the top-end of the Guidelines, 405 months' imprisonment.

In 2011, the district court denied Davis' motion for a reduced sentence after concluding that more than 4.5 kilograms of crack cocaine were attributable to Davis, and therefore his respective Guideline range was not impacted by Amendment 706. Alternatively, the district court concluded that even if Davis did qualify for a two-level reduction in his Guideline range, it would still deny Davis' motion, in the exercise of its discretion, after considering the § 3553(a) factors.

### C. Seantai Suggs

Seantai's PSR indicated that he was Bobby's brother and one of his top lieutenants, and that Bobby relied on him to distribute crack cocaine to the street sellers. The PSR reported that in 1998, the FBI made a series of controlled buys of five grams or more of crack cocaine from Seantai and Davis, and that Seantai and Bobby were active in distributing crack cocaine toward the end of 2000. For sentencing purposes, the PSR advised that Seantai could be held responsible for the distribution of at least 16.91

kilograms of crack cocaine based on Unzueta's statements that he delivered seven kilograms of powder cocaine to Bobby, and supplied Evans with 12 kilograms of powder cocaine. In total, these quantities convert to 16.91 kilograms of crack cocaine, resulting in a base offense level of 38.[6] Seantai received a two-level enhancement because of the numerous firearms used in furtherance of the conspiracy and a three-level enhancement for his role as a top lieutenant. The PSR recommended a total offense level of 43, and in combination with a criminal history category of I, Seantai's suggested Guideline range was life imprisonment. In a 2002 addendum to his PSR, Seantai objected to a number of items in the PSR including the drug types and amounts attributed to him. Despite his objections, the district court adopted the PSR's factual findings and Guideline application, and sentenced Seantai to life imprisonment.

In 2009, Seantai moved for a reduced sentence pursuant to Amendment 706. In ruling upon Seantai's motion, the district court concluded that he was responsible for more than 4.5 kilograms of crack cocaine, and therefore did not qualify for a reduced sentence.

---

[6] The PSR used the drug-equivalency tables in the Guidelines to convert 16.91 kilograms of crack cocaine into a marijuana equivalent, from which it then generated a base offense level. USSG § 2D1.1, comment. (n.10(D)).

### D.  Terraun Price

Price's PSR concluded, on the basis of law enforcement interviews and trial testimony, that Price was responsible for conspiring to distribute more than 1.5 kilograms of cocaine base. The PSR noted that Price had been a member of the conspiracy from at least 1996 until 2001. The PSR also advised that Price was a close associate of Bobby, and that he allowed Bobby to cook powder cocaine in his house, kept Bobby apprised of police presence and gang activity, relayed messages from Bobby to street-level dealers, and received large quantities of crack cocaine from Bobby on a daily basis that he then distributed in large quantities to street-level dealers on "the Hill." The PSR further noted that at Bobby's trial, Unzueta had testified that since at least the end of 1996, Bobby was receiving kilogram quantities of cocaine and Unzueta himself estimated delivering approximately 10 to 15 kilograms of cocaine to Bobby.

Numerous witnesses told investigators that Price supplied them with various amounts of crack cocaine from at least 1995 until 2001. For instance, one witness told investigators that he was supplied with crack cocaine by Bobby, but that Bobby never supplied him "hand-to-hand"; rather, Price was the person who brought the crack cocaine to dealers on "the Hill." This witness began selling crack cocaine on "the Hill" in 1995 and sold drugs "off-and-on" until 2000. Over a two-year period, this witness testified that he purchased 1/16 and 1/8 ounces of crack cocaine from Price about twice a week. Probation estimated that two 1/16-ounce deals per week over a two-

year period is equal to approximately 369 grams of crack cocaine. A separate witness told investigators that he had purchased crack cocaine from Price six times, anywhere from 1/2 ounces to four ounces of crack cocaine each time. Probation estimated that at a minimum, Price sold this witness 1/2 ounces of crack cocaine on five occasions and four ounces of crack cocaine on one occasion, and therefore the six transactions worked out to 184.3 grams of crack cocaine. Yet another witness stated that on one occasion he ordered 1/8 kilogram of crack cocaine from Bobby. The witness received powder cocaine and asked Bobby to cook the powder cocaine into crack cocaine. Bobby, the witness, and Price all cooked the powder cocaine into crack cocaine. Probation estimated that the 1/8 kilogram of cocaine "would result in approximately 111.25 grams of crack cocaine." Another witness testified at Price's trial that Price supplied him with drugs from 1997 until March 2001, and that he purchased crack cocaine from Price on several occasions. A different witness told investigators that she had purchased at least $150 worth of crack cocaine per week from Price and others on "the Hill" for about two years, with her last purchase occurring in 1996. Probation estimated that $150 would typically purchase 1.5 grams of crack cocaine and therefore, over a two-year period she would have purchased approximately 156 grams of crack cocaine from CCA street gang members.

Price's PSR concluded that he was responsible for conspiring to distribute in excess of 1.5 kilograms of crack cocaine, yielding a base offense level of 38. The PSR also recommended a two-level enhancement because Price had conspired to sell drugs with individuals who pos-

sessed firearms, and a three-level enhancement for his role as a manager or supervisor of five or more participants. Price's total offense level was 43 and his criminal history category was IV, yielding a Guideline range of life imprisonment. In a 2003 addendum to the PSR, Price objected to the drug quantity attributable to him. Despite his objections, the district court adopted the factual findings and Guideline application in Price's PSR. The district court sentenced Price to life imprisonment.

In 2009, Price filed a motion for a sentence reduction. In denying Price's § 3582(c)(2) motion, the district court concluded that he was responsible for more than 4.5 kilograms of crack cocaine, and therefore was not eligible for a reduced sentence pursuant to Amendment 706.

### E. Terence Dilworth

Dilworth's PSR concluded that defendants of the conspiracy could be held responsible for at least 16.91 kilograms of crack cocaine, on the basis of Unzueta's statements regarding the quantity of powder cocaine he supplied Bobby and Evans. The PSR further concluded that the total amount of drugs attributable to Dilworth himself exceeded 1.5 kilograms of crack cocaine. According to the PSR, Dilworth was responsible for bringing crack cocaine users, or customers, to "the Hill" in the early 1990s. Witnesses recounted that Dilworth had been selling on "the Hill" since at least 1993 or 1994. Additionally, the PSR indicated that Dilworth

received large quantities of crack cocaine directly from Bobby to distribute to street-level dealers. The PSR noted that one source advised the FBI that Dilworth was not a street-level dealer on "the Hill," but rather more of a leader and other people on "the Hill" showed him respect. Importantly, a confidential informant who lived in the Concord area for approximately seven months in 2000 stated that he or she had observed five or six CCA street gang members, two of whom were Dilworth and Davison, selling on average at least an "eight-ball"[7] of crack cocaine per day on "the Hill." Accordingly, the PSR estimated that over a seven-month period, a group of five individuals selling an average of 3.5 grams of crack cocaine per day, resulted in the sale of 3,675 grams of crack cocaine, or approximately 3.675 kilograms of crack cocaine. Several witnesses also indicated that Bobby supplied a few people, including Dilworth with "weight" crack cocaine and that Dilworth was present when Bobby cooked cocaine into crack cocaine. Other sources noted that Dilworth sold crack cocaine out of Davis' house on Grant Street in Gary.

Dilworth's PSR concluded that his criminal activity was distributing in excess of 1.5 kilograms of crack cocaine, culminating in a base offense level of 38. The PSR also recommended a two-level enhancement because a witness had indicated that Dilworth carried a firearm while he sold drugs and was a member of the conspir-

---

[7] An "eight-ball" refers to 1/8 of an ounce of crack cocaine, or approximately 3.5 grams of crack cocaine.

acy. Dilworth's total offense level was 40, and his criminal history category was III, resulting in a Guideline range of 360 months' to life imprisonment. In a 2003 addendum to the PSR, Dilworth contested the evidence relied upon by probation. Despite his objections, the district court adopted the PSR's factual findings and Guideline application. The district court sentenced Dilworth to 360 months' imprisonment, the low-end of the Guidelines.

In 2011, the district court denied Dilworth's motion for a sentence reduction after finding that he was responsible for more than 4.5 kilograms of crack cocaine, and therefore Amendment 706 did not impact his sentence.

### F. William Davison

Although Davison was found not guilty at trial on the conspiracy charge against him, probation contended that there was enough evidence to conclude that he was a member of the conspiracy as early as 1997, that he engaged in a jointly undertaken criminal enterprise, and that it was reasonably foreseeable to him that the conspiracy was distributing in excess of 1.5 kilograms of crack cocaine. On the basis of statements from numerous informants, the PSR advised that Davison sold crack cocaine in the Concord area from 1997 until 2000. The PSR described two sales of crack cocaine totaling 1.47 grams that Davison made to confidential informants in June 2000 and that formed the basis of his convictions. The PSR also noted that a confidential informant had purchased 1/2 ounces of crack cocaine from Davison between 1997 and 2000, and that an under-

cover officer purchased .15 grams of crack cocaine from Davison on "the Hill" in July 1997. Most importantly, as in Dilworth's PSR, a confidential informant reported that in 2000, Davison and four or five other individuals sold an "eight-ball" of crack cocaine per day on "the Hill" over a seven-month period. Accordingly, the PSR estimated that this group of five individuals sold approximately 3.675 kilograms of crack cocaine during this time period. Finally, the PSR recounted that cooperating informants described Davison as a "shooter" for the CCA street gang. Informants described having seen Davison shooting in the air and shooting at passing vehicles. The PSR also detailed Davison's involvement in at least two murders in 1999 and 2000. Probation therefore concluded that Davison had engaged in a "'jointly undertaken criminal enterprise' with other members of the conspiracy and that the activity of the jointly undertaken criminal enterprise to distribute in excess of 1.5 kilograms of crack cocaine was 'reasonably foreseeable to [Davison].'"

Based on the foregoing findings, the PSR recommended a base offense level of 38 because Davison's criminal activity was in excess of 1.5 kilograms of crack cocaine. Additionally, the PSR recommended a two-level enhancement because of Davison's role as a "shooter" for the CCA street gang. Davison's total offense level was therefore 40, and when combined with a criminal history category of I, his Guideline range was 292 to 365 months' imprisonment. The district court adopted the factual findings and Guideline application in the PSR, and sentenced Davison within the Guidelines, to 360 months' imprisonment.

In 2009, Davison moved for a reduced sentence. In connection with his § 3582(c)(2) motion, probation filed an addendum to his PSR advising that Davison qualified for a reduced sentence pursuant to Amendment 706. The district court nonetheless denied Davison's motion after concluding that he was responsible for more than 4.5 kilograms of crack cocaine, and therefore Amendment 706 did not impact his sentence.

## II.  DISCUSSION

On appeal, Bobby, proceeding *pro se*, challenges the district court's conclusion that he does not benefit from a revised Guidelines range. Davis, Seantai, Price, Dilworth and Davison each challenge the district court's conclusion that they were responsible for distributing more than 4.5 kilograms of crack cocaine, and therefore are not eligible for relief.

We review a challenge to the district court's authority to modify a sentence de novo. *United States v. Johnson*, 571 F.3d 716, 717 (7th Cir. 2009) (quoting *United States v. Lawrence*, 535 F.3d 631, 634 (7th Cir. 2008)). A district court's decision to deny a reduction in sentence under § 3582(c)(2), however, is reviewed for abuse of discretion. *United States v. Young*, 555 F.3d 611, 615 (7th Cir. 2009); *Mark Hall*, 582 F.3d at 817. A district court "abuses its discretion when it resolves a matter in a way that no reasonable jurist would, or when its decision strikes us as fundamentally wrong, arbitrary, or fanciful." *United States v. Paul*, 542 F.3d 596, 599 (7th Cir. 2008). This is a

highly deferential standard of review that essentially requires us to determine whether the process by which the district court resolved the § 3582(c)(2) motion was reasonable. *Young*, 555 F.3d at 615.

A term of imprisonment constitutes a final judgment that may not be modified except in limited circumstances. *Dillon v. United States*, ___ U.S. ___, 130 S.Ct. 2683, 2690, 177 L.Ed.2d 271 (2010). Section 3582(c)(2) creates "an exception to the general rule of finality in the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered" and made retroactive by the Sentencing Commission. *Id.* (internal quotation marks omitted) (quoting 18 U.S.C. § 3582(c)(2)). Section 3582(c)(2) allows a district court to reduce a sentence if two conditions are met: (1) the original sentence was "based on a sentencing range that has subsequently been lowered by the Sentencing Commission," and (2) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[,]" namely § 1B1.10(a). 18 U.S.C. § 3582(c)(2); *United States v. Guyton*, 636 F.3d 316, 318 (7th Cir. 2011); USSG § 1B1.10(a)(2), p.s. (Nov. 2011). If the "first condition is not met, a district court lacks subject-matter jurisdiction to consider the movant's request for a sentence reduction under § 3582(c)(2)." *United States v. Forman*, 553 F.3d 585, 588 (7th Cir. 2009); *Lawrence*, 535 F.3d at 637. As to the second condition, a sentence reduction pursuant to Amendment 706 is not consistent with the Sentencing Commission's applicable policy statements if Amendment 706 "does not have the effect of

lowering the defendant's *applicable guideline range*." USSG § 1B1.10(a)(2)(B), p.s. (Nov. 2011) (emphasis added). After determining that a sentence reduction is consistent with applicable policy statements, § 3582(c)(2) instructs a district court to consider the § 3553(a) factors and determine whether, in its discretion, the reduction authorized by reference to the Sentencing Commission's policies is warranted in whole or in part under the particular circumstances of the case. *Dillon*, 130 S.Ct. at 2692. Further, the Supreme Court has clarified that § 3582(c)(2) "does not authorize a sentencing or resentencing proceeding. Instead, it provides for the 'modif[ication of] a term of imprisonment' by giving courts the power to 'reduce' an otherwise final sentence in circumstances specified by the [Sentencing] Commission." *Id.* at 2690.

### A. Bobby Suggs

We turn first to Bobby's *pro se* motion. In denying his motion for a sentence reduction, the district court concluded that it lacked "statutory authorization and corresponding jurisdiction" to reduce his sentence because his Guideline range had not been lowered by Amendment 706. On appeal, Bobby asserts that he is entitled to a sentence reduction pursuant to Amendment 706 and that he should receive a lower sentence pursuant to the § 3553(a) factors. Relying on *Kimbrough v. United States*, in which the Supreme Court held that district courts could consider the crack/powder disparity in sentencing and impose a below-Guidelines sentence on a drug traf-

ficker dealing in crack cocaine due to the disparity, Bobby argues that the district court had "complete discretion" to disregard the Guideline range and impose an appropriate sentence. 552 U.S. 85, 91, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007). We affirm the denial of relief.

"Subject-matter jurisdiction is 'the court's statutory authority or constitutional *power* to adjudicate a case.'" *Lawrence*, 535 F.3d at 636 (quoting *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 89, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998); citing *United States v. Cotton*, 535 U.S. 625, 630, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002)). "It 'delineat[es] the classes of cases . . . falling within a court's adjudicatory authority." *Id.* (quoting *Eberhart v. United States*, 546 U.S. 12, 16, 126 S.Ct. 403, 163 L.Ed.2d 14 (2005)). Contrary to Bobby's suggestion, "there is no 'inherent authority' for a district court to modify a sentence as it pleases[.]" *United States v. Cunningham*, 554 F.3d 703, 708 (7th Cir. 2009). Pursuant to § 3582(c)(2), Congress has authorized district courts to modify a sentence in cases where a defendant "has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission . . . ." 18 U.S.C. § 3582(c)(2); *Johnson*, 571 F.3d at 717; *Lawrence*, 535 F.3d at 637. When a case falls within that class, subject-matter jurisdiction is proper. *Lawrence*, 535 F.3d at 637. Although § 3582(c)(2) also limits a "court's authority to reduce a sentence by requiring that it consider § 3553(a) and reduce a sentence only if it is consistent with the [Sentencing Commission's] applicable policy statements[,]" these limitations only apply once a court has jurisdiction. *Id.* at 637-38; *United States v. Poole*, 550 F.3d 676, 678 n.1 (7th Cir.

2008). That is to say, where a court reduces a defendant's sentence without considering the § 3553(a) factors or without ensuring that the amendment has the effect of lowering the defendant's applicable Guideline range, such errors are not jurisdictional ones.

In the 2009 addendum to Bobby's PSR, probation concluded that Bobby's criminal activity was in excess of 4.5 kilograms of crack cocaine. Specifically, the 2009 addendum noted that the district court had adopted the findings of Bobby's PSR, which established that Bobby was responsible for 17.1 kilograms of crack cocaine. Under § 2D1.1 of the revised Guidelines, the two-level reduction of a base offense level does not apply where the relevant conduct involved more than 4.5 kilograms of crack cocaine. *See Johnson*, 571 F.3d at 717. Because Bobby was responsible for more than 4.5 kilograms of crack cocaine, his sentence was not "based on" a sentencing range that was subsequently lowered. Accordingly, the district court did not have the power to adjudicate Bobby's motion and lacked subject-matter jurisdiction. *See Lawrence*, 535 F.3d at 637.

Bobby next argues that the district court should have considered the § 3553(a) factors and his post-sentencing conduct. Section 3582(c)(2) does not allow resentencing based solely on § 3553(a) factors, however. During a § 3582(c)(2) sentence modification proceeding, § 3553(a) factors are considered only after the district court has already determined a defendant's eligibility for a sentence modification and "cannot serve to transform the proceedings under § 3582(c)(2) into plenary

resentencing proceedings." *Dillon*, 130 S.Ct. at 2691-92. Here, the district court had no basis to consider the § 3553(a) factors because Bobby was simply not eligible for a sentence reduction.

### B. Aaron Davis

In denying Davis' § 3582(c)(2) motion, the district court first concluded that "Davis' guideline range is not impacted by the amendments, and so he does not qualify for a sentence reduction." The district court based its conclusion on its belief that at Davis' original sentencing hearing, it made "a factual finding that 19.8 kilograms of crack cocaine was attributable to [Davis.]" The crux of Davis' argument on appeal is that the district court was limited to its factual findings at his original sentencing that he was responsible for "at a minimum 1.5 kilograms of crack cocaine," and that the district court impermissibly made new findings in the § 3582(c)(2) proceeding in order to hold him responsible for 19.8 kilograms of crack cocaine. Davis argues that in denying his § 3582(c)(2) motion, the district court relied on extraneous statements it made at his original sentencing hearing regarding the drug quantity attributable to him, and that those extraneous statements cannot be viewed as findings of fact. According to Davis, the district court made a specific finding that he was responsible for 1.5 kilograms of crack cocaine and while the district court could have made a finding that Davis was responsible for a different amount, it "eschewed the need to make any more particular find-

ing[.]" Davis also contends that at his original sentencing hearing, the district court did not fully inquire into the scope of his criminal involvement between 1998, when he moved to Indianapolis, and 2001.

"For sentencing purposes, a criminal defendant convicted of a drug trafficking conspiracy is liable for the reasonably foreseeable quantity of drugs sold by his or her co-conspirators." *United States v. Seymour*, 519 F.3d 700, 710-11 (7th Cir. 2008). At sentencing, a district court need only make findings of fact, such as the quantity of drugs attributable to a defendant, by a preponderance of the evidence. *United States v. Krasinsi*, 545 F.3d 546, 551 (7th Cir. 2008). A proposition proved by a preponderance of the evidence is one that has been shown to be more likely than not. *E.g., United States v. Foster*, 577 F.3d 813, 815 (7th Cir. 2009). At Davis' original sentencing, which he did not appeal, the district court indicated that it was reasonably foreseeable to Davis, who was a close associate of Bobby, that more than 1.5 kilograms of crack cocaine were involved in the conspiracy, and more likely than not 19.8 kilograms of crack cocaine were reasonably foreseeable to him. Contrary to Davis' arguments, these were not extraneous statements; rather, they comprised the district court's finding, by a preponderance of the evidence, that Davis was responsible for the reasonably foreseeable quantity of drugs, 19.8 kilograms of crack cocaine, that was involved in this particular conspiracy. Because the district court had already determined that Davis was responsible for 19.8 kilograms of crack cocaine, Amendment 706 would not serve to reduce his sentence and his § 3582(c)(2) motion was properly denied.

Additionally, contrary to Davis' contentions, the district court was required to determine the amount of crack cocaine attributable to Davis in order to adjudicate his § 3582(c)(2) motion. *See United States v. Dewayne Hall*, 600 F.3d 872, 877 (7th Cir. 2010) (hereinafter "*Dewayne Hall*"). Nothing prevents a district court from making new findings of fact when ruling on a § 3582(c)(2) motion, so long as those findings are not inconsistent with those made at the original sentencing. *United States v. Duncan*, 639 F.3d 764, 767-68 (7th Cir. 2011) (quoting *United States v. Woods*, 581 F.3d 531, 538 (7th Cir. 2009) and *Dewayne Hall*, 600 F.3d at 876). Indeed, new findings are often necessary where, as here, retroactive amendments have altered the relevant drug-quantity thresholds for determining a defendant's base offense level. *Dewayne Hall*, 600 F.3d at 876 (citing *Mark Hall*, 582 F.3d at 819). In adjudicating a § 3582(c)(2) motion, a district court may consider the record as a whole, including the defendant's motions, the government's responses, and any addenda to the PSRs explaining the scope of a drug trafficking conspiracy before reaching a conclusion on the drug quantity attributable to a defendant. *Woods*, 581 F.3d at 539; *see also Dewayne Hall*, 600 F.3d at 876.

Here, the district court made new findings of fact by relying on its earlier statements at Davis' original sentencing hearing and the figures presented in his PSR, which the district court had previously adopted. The district court also considered a 2008 addendum to the PSR, which stated that the court had previously made a finding of fact that Davis was responsible for 19.8 kilograms of crack cocaine. The evidence in the PSR estab-

lished that Davis was one of Bobby's top lieutenants who distributed the crack cocaine Bobby cooked to other CCA street gang members, the FBI made several controlled purchases of crack cocaine from Davis in 1998, Davis sold crack cocaine to Carter, and the FBI recovered crack cocaine from CCA street gang members over 20 times. Relying on statements from Unzueta as to the amount of powder cocaine he delivered to Bobby, which was then cooked into crack cocaine, the PSR concluded that Davis could be held responsible for at least 19.8 kilograms of crack cocaine. In short, there was more than sufficient evidence in the PSR from which the district court could conclude that Davis was responsible for 19.8 kilograms of crack cocaine. We find that the district court did not abuse its discretion in denying Davis' motion.

We also find no merit to Davis' argument that the district court did not fully inquire into the scope of his involvement between 1998 and 2001. We have long held that a district court may rely on factual information contained in a PSR "so long as it bears sufficient indicia of reliability to support its probable accuracy." *United States v. Salinas*, 365 F.3d 582, 587 (7th Cir. 2004); *United States v. Turner*, 604 F.3d 381, 385 (7th Cir. 2010). Generally, a defendant then bears the burden of showing that the PSR is not accurate or is unreliable. *United States v. Artley*, 489 F.3d 813, 821 (7th Cir. 2007). A defendant does not satisfy that burden merely by denying the facts in the PSR; rather, a defendant must produce some evidence that calls into question the reliability of the alleged facts. *Salinas*, 365 F.3d at

587; *Turner*, 604 F.3d at 385. Only after a defendant's objection casts doubt as to the reliability of the information in the PSR does the government then have the burden of demonstrating the accuracy of the information. *United States v. Heckel*, 570 F.3d 791, 795-96 (7th Cir. 2009). Although Davis concedes that he did not present any evidence at his original sentencing limiting his role in the conspiracy to the early years of the scheme, he contends that the evidence presented by the government did not explain his involvement in the conspiracy between 1998 and 2001.

Davis' contentions fail to cast doubt on the PSR's recommendation that he continued to be a part of the conspiracy until 2001 and is therefore responsible for 19.8 kilograms of crack cocaine. In order to withdraw from a conspiracy, a criminal defendant must take some affirmative act of withdrawal, such as confessing to the authorities or communicating his withdrawal to his co-conspirators. *United States v. Morales*, 655 F.3d 608, 640 (7th Cir. 2011). "'Simply ceasing to participate even for extended periods of time is not sufficient to show withdrawal.'" *United States v. Julian*, 427 F.3d 471, 483 (7th Cir. 2005) (quoting *United States v. Hall*, 212 F.3d 1016, 1023 (7th Cir. 2000)). According to the PSR, Carter informed investigators that even after Davis moved to Indianapolis, he would travel between Gary and Indianapolis and Carter would purchase crack cocaine from Davis. Furthermore, the record does not contain any evidence that Davis affirmatively withdrew his membership at any point in time after 1998 by reporting himself to authorities or by communicating his

withdrawal to CCA street gang members. Rather, the February 2001 letter from Carson demonstrates that he continued to associate with CCA members until at least February 2001. Finally, contrary to Davis' argument, the district court did consider the extent of his involvement in the conspiracy between 1998 and 2001. Although Davis objected to the PSR's findings that he was involved in the conspiracy after 1998, as outlined in the 2003 addendum to the PSR, the district court declined to adopt his position and instead adopted the findings of the government and probation that he continued to be involved with the conspiracy until 2001.

Alternatively, the district court concluded that even if Davis did qualify for a two-level reduction in his Guideline range, it would decline to reduce Davis' sentence because the sentence appropriately reflected the seriousness of the offense and the need to protect the public, and because it was "particularly appropriate to consider the need to avoid sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]" Davis' final argument on appeal is that the court's refusal to exercise its discretion to grant him a sentence reduction rests upon its erroneous factual findings, and denying him a sentence reduction actually creates a sentencing disparity because he will be punished more harshly than other defendants convicted of similar conduct. Once a district court concludes that a defendant is eligible for a reduction in sentence, the district court must then "determine the extent of that reduction, if any, by considering the factors listed in 18 U.S.C. § 3553(a), the [defendant's]

conduct while imprisoned, and the risk his early release would pose to public safety." *United States v. Marion*, 590 F.3d 475, 477 (7th Cir. 2009) (internal quotation marks omitted) (quoting *United States v. Johnson*, 580 F.3d 67, 570 (7th Cir. 2009)). In ruling on a motion to reduce, a district court is required to supply the reasons for its decision and its order need only contain a minimal explanation as to how it exercised its discretion. *Id.* at 477-78. Importantly, a district court "need not provide a detailed, written explanation analyzing every § 3553(a) factor." *Id.* at 477. Here, the district court considered some of the § 3553(a) factors and provided a straightforward explanation as to why it would deny Davis' motion on this alternative basis. We find that this explanation was sufficient to withstand scrutiny. Additionally, Davis' contention that the denial of a sentence reduction results in a sentencing disparity is meritless, as his coconspirators were all sentenced to similar, if not longer, terms of imprisonment.

### C.  Seantai, Price, Dilworth, and Davison

We turn next to Seantai, Price, Dilworth, and Davison, who are represented by the same counsel on appeal. They each argue that the district court erroneously denied their § 3582(c)(2) motions for sentence reductions by making new factual findings that they were each responsible for distributing more than 4.5 kilograms of crack cocaine. They also contend that because they went to trial, as opposed to pleading guilty, the quantity of crack cocaine and reliability of evidence establishing those

quantities remained at issue and the district court therefore had a duty to inquire into the scope of criminal activity that they each agreed to undertake. We conclude that the district court did not abuse its discretion in finding that Seantai, Price, Dilworth, and Davison were each responsible for more than 4.5 kilograms of crack cocaine.

### 1. Seantai Suggs

In denying Seantai's motion for a sentence reduction, the district court concluded that due to the quantity of crack cocaine attributable to Seantai, the amended Guidelines did not impact his sentence and therefore he did not qualify for a sentence reduction. The district court based its conclusion on statements it made at Seantai's original sentencing hearing rejecting Seantai's objections to the drug quantity findings in his original PSR and adopting the government's and probation's positions. Therefore, according to the district court, it had already made an explicit finding attributing over 16 kilograms of crack cocaine to Seantai. Alternatively, the district court concluded that even if it had not made such a finding at Seantai's original sentencing hearing, it "would not hesitate to make a new finding that [Seantai] is responsible for far in excess of 4.5 kilograms of crack cocaine as a foreseeable quantity distributed by his conspiracy."

On appeal, Seantai argues that the district court erroneously denied his motion for a sentence reduction because at his original sentencing it only found that he

"should be held responsible for far in excess of 1.5 kilograms of crack cocaine[,]" and it did not find that he was responsible for 16.91 kilograms of crack cocaine. Therefore, Seantai argues, any such conclusion reached by the district court in denying his motion for a sentence reduction was a new factual finding.[8] Seantai also argues that the district court's conclusion that Seantai was a primary player in the conspiracy was based on highly contested facts, and its statement that Seantai did not present any evidence to refute the government's assertions is misplaced because it is the government's burden to prove quantity. Finally, Seantai contends that the court's denial of his motion was based entirely on foreseeability, and the district court failed to assess the scope of his jointly undertaken activity.

As discussed above, assuming the district court did not make a factual finding as to quantity at Seantai's original sentencing hearing, the court was required to make such a finding in adjudicating his § 3582(c)(2) motion. *Dewayne Hall*, 600 F.3d at 877. A new factual finding on a § 3582(c)(2) motion is appropriate so long as it is not inconsistent with the district court's findings at the original sentencing hearing. *Woods*, 581 F.3d at 538. As an initial matter, Seantai concedes that at his original

---

[8] Because the sentencing hearing transcript of Seantai's sentencing hearing has not been made part of the record, nor has Seantai included a copy of the relevant pages of the sentencing hearing transcript in his appendix, we are unable to evaluate the district court's statements at Seantai's original sentencing hearing. We may review, however, whether the district court's new factual finding was appropriate.

sentencing hearing the district court found that he should be held "responsible for far in excess of 1.5 kilograms of crack cocaine." Had the original sentencing court found that Seantai was responsible for exactly 1.5 kilograms of crack cocaine, this would be a different case, but a finding that he was responsible for over 4.5 kilograms of crack cocaine is not inconsistent with the district court's finding at his original sentencing hearing. *Woods*, 581 F.3d at 539; *see also United States v. Moore*, 582 F.3d 641, 646 (6th Cir. 2009).

In making its new factual finding as to the quantity of drugs attributable to Seantai, the district court relied on evidence from Seantai's trial, and summarized in his PSR, such as the testimony from Unzueta that he supplied Bobby with kilogram quantities of powder cocaine. Seantai's PSR, which the district court adopted despite his objections, made it clear that he and Davis were Bobby's top lieutenants who distributed the crack cocaine Bobby cooked to other CCA street gang members, that the FBI made a series of controlled purchases of crack cocaine from him and Davis in 1998, and that the FBI recovered crack cocaine from CCA street gang members on over 20 occasions. On the basis of this information, the PSR concluded that Seantai was responsible for 16.91 kilograms of crack cocaine, far in excess of the 4.5 kilogram threshold in § 2D1.1 for a sentence reduction. There was substantial evidence in Seantai's PSR from which the district court could find that Seantai was responsible for 16.91 kilograms of crack cocaine.

Seantai's arguments that the information in the PSR was based on highly contested facts and that the government bears the burden of establishing drug quantities are unavailing. As we previously noted, it is well-established that the district court may rely on factual information contained in a PSR "so long as it bears sufficient indicia of reliability to support its probable accuracy." *Salinas*, 365 F.3d at 587. Even as to controverted facts, a court's reference to the PSR "'constitutes sufficient findings . . . when we are assured that the district court made a decision of design, rather than of convenience, to adopt the PSR.'" *Heckel*, 570 F.3d at 796 (quoting *United States v. Burke*, 148 F.3d 832, 836 (7th Cir. 1998)). Seantai then bears the burden of showing that the PSR is not accurate or is unreliable, *Artley*, 489 F.3d at 821, but he has proffered no evidence in the § 3582(c)(2) proceeding to call into question the facts contained in the PSR. A bare denial of the information contained in the PSR is simply not sufficient to challenge the PSR's accuracy or reliability. *Turner*, 604 F.3d at 385. Accordingly, the district court acted well within its discretion when it relied upon the findings contained in the PSR.

Finally, while Seantai is correct that the district court did not explicitly mention the scope of his involvement in the conspiracy, the district court did adopt the factual findings in the PSR which contained more than enough evidence from which to make such a finding. "The reference to the findings and rationale in the presentence report allows us, as a reviewing court, to evaluate the district court's decision, and that is all that is required." *United States v. Brimley*, 148 F.3d 819, 822

(7th Cir. 1998) (quoting *United States v. Taylor*, 135 F.3d 478, 483 (7th Cir. 1998)); *see also United States v. Brumfield*, 301 F.3d 724, 735 (7th Cir. 2002) ("[I]t is permissible for a district court to discharge its obligation to make factual findings by adopting the contents and analysis of the PSR.") (citing *United States v. Parolin*, 239 F.3d 922, 925 (7th Cir. 2001) and *Taylor*, 135 F.3d at 482). The Guidelines instruct that a defendant involved in jointly undertaken criminal activity may be held accountable for "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." USSG § 1B1.3(a)(1)(B) (Nov. 2011); *see also Turner*, 604 F.3d at 385 (quoting *United States v. Soto-Piedra*, 525 F.3d 527, 531 (7th Cir. 2008)). "Thus, in a drug conspiracy, 'each conspirator is responsible not only for drug quantities directly attributable to him but also for amounts involved in transactions by coconspirators that were reasonably foreseeable to him.'" *Turner*, 604 F.3d 381 (quoting *United States v. Acosta*, 534 F.3d 574, 585 (7th Cir. 2008)); *see also Seymour*, 519 F.3d at 710-11. "Reasonable foreseeability refers to the scope of the agreement that [a defendant] entered into when he joined the conspiracy, not merely to the drugs he may have known about." *United States v. Flores*, 5 F.3d 1070, 1083 (7th Cir. 1993). Furthermore, reasonable foreseeability does not require a showing "that the defendant was involved in or even had direct knowledge of any particular transaction." *Seymour*, 519 F.3d at 711.

Here, more than 4.5 kilograms of crack cocaine were reasonably foreseeable to Seantai. As detailed in his PSR, Seantai played a key role in the conspiracy, acting as a

top lieutenant alongside Davis, who distributed the crack cocaine Bobby cooked to street-level dealers. Through this role, Seantai was aware of the quantities of drugs Bobby was receiving from Unzueta and distributing in the form of crack cocaine. Considering his substantial involvement in the conspiracy throughout its life, it was well within the district court's discretion to find that Seantai was responsible for more than 4.5 kilograms of crack cocaine.

### 2. Terraun Price

In denying Price's motion for a sentence reduction, the district court concluded that because the evidence in the record established that he was responsible for more than 4.5 kilograms of crack cocaine, he was not eligible for a sentence reduction. On appeal, Price argues that "the district court did not carefully consider the facts relating to the quantity of drugs attributable to [him] and therefore his eligibility for reduction." According to Price, the quantity of drugs for which he is directly responsible does not add up to 4.5 kilograms of crack cocaine. Like Seantai, Price also argues that the district court did not inquire into the scope of his jointly undertaken criminal activity.

Price's arguments are unpersuasive because the district court properly considered the record as whole, Price's arguments and the government's arguments, as well as the original PSR and the 2008 addendum to the PSR, which explained Price's role in the conspiracy, before finding that Price was responsible for more than 4.5 kilograms of crack cocaine. *Woods*, 581 F.3d at 538.

The PSR, which the district court adopted, established that he was involved in the conspiracy from 1995 to 2001, and during this time he participated in a number of roles. For instance, he allowed Bobby to cook powder cocaine in his house, he kept Bobby apprised of police presence and gang activity, he relayed messages from Bobby to the street-level dealers, and he distributed crack cocaine from Bobby to the street-level dealers. Additionally, the PSR detailed numerous witness accounts about Price's involvement in the conspiracy and his sales of crack cocaine. While the precise quantity of drugs that Price himself distributed may not add up to 4.5 kilograms of crack cocaine, this fact is not disposi- tive because defendants "convicted of a drug trafficking conspiracy [are] liable for the reasonably foreseeable quantity of drugs sold by [their] co-conspirators." *Seymour*, 519 F.3d at 710-11. Here, we have previously concluded that the CCA street gang was responsible for distributing at least 16 kilograms of crack cocaine throughout the course of the conspiracy's life. *Dewayne Hall*, 600 F.3d at 876. Price was not a regular street-level dealer in this conspiracy. Rather, he was a close confidant of Bobby and acted as a messenger between Bobby and the street- level dealers. As noted by the district court, Price's role allowed him to become familiar with the number of dealers and types and quantities of drugs they were distributing. There was ample evidence from which the district court could conclude that Price was accountable for at least 4.5 kilograms of crack cocaine.

Price's argument that the district court failed to discuss the scope of his criminal activity is unavailing. While

the district court did not explicitly mention the scope of Price's involvement in the conspiracy, it did adopt the factual findings and Guideline application in his PSR. Again, Price was involved in the conspiracy at a high level, and in his many roles he was well aware of the quantities of crack cocaine Bobby was cooking and distributing. The district court acted within its discretion in finding that it was reasonably foreseeable to Price that the conspiracy was distributing in excess of 4.5 kilograms of crack cocaine.

### 3.  Terence Dilworth

In denying Dilworth's motion for a sentence reduction, the district court concluded that it was foreseeable to Dilworth "that he was participating in a conspiracy that was distributing far in excess of 4.5 kilograms of crack cocaine," and therefore Amendment 706 did not impact his sentence. The district court reached this conclusion after reviewing the evidence in the record, including Dilworth's PSR. On appeal, Dilworth argues that at his original sentencing hearing, the district court did not make a factual finding that he was responsible for more than 4.5 kilograms of crack cocaine, despite its "off-handed remark that [] [he] is 'responsible for many more kilos of crack cocaine than 1.5 [kilograms].'" Accordingly, Dilworth contends that because the district court relied on new factual findings, it had a duty to inquire into the scope of the criminal activity for which he was responsible, but that it failed to do so. Dilworth also argues that in denying his motion the district court relied on

contested and unreliable evidence, such as hearsay testimony of witnesses, which he objected to at his original sentencing hearing.

In ruling upon Dilworth's § 3582(c)(2) motion, it was entirely appropriate for the district to make new findings of fact as to the quantity of drugs attributable to Dilworth, so long as those findings are consistent with the findings from the original sentencing hearing. *Duncan*, 639 F.3d at 767-68. The district court's finding that Dilworth was responsible for more than 4.5 kilograms of crack cocaine is consistent with its earlier finding that Dilworth was "'responsible for many more kilos of crack cocaine than 1.5 [kilograms].'" *See Woods*, 581 F.3d at 539. The district court reached its drug quantity finding only after considering all the evidence in the record, including the PSR, which the court had previously adopted over Dilworth's objections. Although Dilworth contends that the evidence in the PSR was contested and unreliable, he had the burden of establishing the unreliability of the evidence. *Artley*, 489 F.3d at 821. Yet, on the record before us, Dilworth has not proffered any evidence in the § 3582(c)(2) proceedings to contest the reliability of the information contained in the PSR. As we have previously noted, a district court may make factual findings by adopting the PSR even as to contested matters. *Heckel*, 570 F.3d at 796. Dilworth's PSR emphasized that he was more than a street-level dealer because he received large quantities of crack cocaine directly from Bobby to distribute to street-level dealers on "the Hill." The PSR also noted that Dilworth had been responsible for bringing customers to "the Hill" in the early 1990s, and

that Dilworth himself had been selling drugs on "the Hill" since at least 1993 or 1994. Most importantly, Dilworth and a group of four or five other CCA street gang members were observed selling 3.5 grams of crack cocaine per day on "the Hill" over a seven-month period in 2000. That is approximately 3.675 kilograms of crack cocaine in just seven months. Taking into account that Dilworth was a member of the conspiracy for a number of years, had been selling on "the Hill" since 1993 or 1994, and that he was more than a street-level dealer, there was more than ample evidence in the PSR to support the district court's finding that it was foreseeable to him that he was participating in a conspiracy that was distributing more than 4.5 kilograms of crack cocaine. Accordingly, it was not an abuse of discretion for the district court to deny his motion.

Finally, this Court must reject Dilworth's argument that the testimony in the PSR was contested and unreliable because it contained the hearsay testimony of witnesses. At sentencing a district court may rely on a PSR containing hearsay, so long as those statements are reliable. *United States v. Isom*, 635 F.3d 904, 908 (7th Cir. 2011) ("At sentencing, courts may rely on presentence reports containing even double-hearsay, i.e., statements by coconspirators to investigators, so long as those statements are reliable."). It was Dilworth's burden to show the inaccuracy or unreliability of facts in the PSR, and Dilworth has not presented any evidence to cast doubt on the PSR. *Artley*, 489 F.3d at 821 (affirming sentence as based upon sufficient evidence, even though statements establishing drug quantity amounts in the PSR

were hearsay). Moreover, the statements in the PSR were internally consistent as to Dilworth's participation in the conspiracy. Accordingly, the district court acted within its discretion in choosing to rely upon such statements.

### 4. William Davison

In denying Davison's motion for a sentence reduction, the district court concluded that Davison was not eligible for a reduced sentence because he was responsible for more than 4.5 kilograms of crack cocaine. In determining the quantity that was reasonably foreseeable to Davison, the district court relied on his original PSR, and primarily the portion of the PSR containing statements from a confidential informant that "for a seven-month period in 2000, [] Davison, along with four or five other members of the [CCA street] gang, took turns selling crack cocaine at a location known as 'the Hill,' and that each was selling approximately an 'eight-ball' (1/8 ounce, or approximately 3.5 grams) a day." Notably, the district court reached this conclusion despite probation's recommendation in a 2008 addendum to the PSR that Amendment 706 applied to Davison. On appeal, Davison argues that the district court's finding that he was responsible for in excess of 4.5 kilograms of crack cocaine is erroneous. Davison argues that the district court failed to discuss the actual quantity of drugs for which he was responsible, and that he should not be treated like the other conspirators. According to Davison, even if he were held "responsible for sales of 3.5 grams per day,

a figure discussed in his PSR, for the entire three years he was alleged to be selling drugs on 'the [H]ill,' the total amount of drugs distributed would approximate 3.7 kilograms." Therefore, Davison argues, his conduct does not reach the 4.5 kilograms threshold.

Here, the district court properly considered the record as whole, the government's arguments and Davison's arguments, as well as the original PSR and the 2008 addendum to the PSR, before finding that Davison was responsible for more than 4.5 kilograms of crack cocaine. *Woods*, 581 F.3d at 538. The PSR, which the district court adopted, noted that Davison had been a member of the conspiracy as early as 1997, and that he sold crack cocaine in the Concord area from 1997 until 2000. The PSR also described Davison's role as a shooter for the CCA street gang and his involvement in two murders. Most importantly, Davison and a group of four or five other CCA street gang members were observed selling 3.5 grams of crack cocaine on "the Hill" per day over a seven-month period in 2000. In total, this group of individuals sold about 3.675 kilograms of crack cocaine in just seven months. Considering that Davison was a member of the conspiracy for a number of years, there was sufficient evidence in the PSR to support the district court's finding that it was foreseeable to him that he was participating in a conspiracy that was distributing more than 4.5 kilograms of crack cocaine. While the 2008 addendum to the PSR recommended that Davison did qualify for a two-level reduction in his base offense level, we note that the decision of whether or not to grant a sentence reduction is entrusted to the discretion

of the district court, and it is the judge's perspective that is most important. *Young*, 555 F.3d at 614.

Finally, Davison's contention that he should only be held responsible for the drugs he was selling on "the Hill" does not help him as he is responsible not just for the amounts that he was personally selling, but also "for the reasonably foreseeable quantity of drugs sold by his . . . co-conspirators." *Seymour*, 519 F.3d at 710-11. The minimum amount of crack cocaine that would have been reasonably foreseeable to him from the activities of his four conspirators on "the Hill" over a three-year period would have exceeded 4.5 kilograms of crack cocaine. Accordingly, the district court did not abuse its discretion by finding that Davison was responsible for 4.5 kilograms of crack cocaine over the course of his three-year involvement with the conspiracy.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's denial of the defendants' § 3582(c)(2) motions.